**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank WALUS, a/k/a Franciszek Walus,
Defendant-Appellant.**

Nos. 78–1732, 79–1140, 79–1587
and 79–1629.

United States Court of Appeals,
Seventh Circuit.

Argued April 26, 1979.

Decided Feb. 13, 1980.

284

Charles W. Nixon, Charles O. Brizius, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Linda A. Wawzenski, Frederick H. Branding, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before PELL, Circuit Judge, MOORE, Senior Circuit Judge,* and WOOD, Circuit Judge.

* Senior Circuit Judge Leonard Page Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

PELL, Circuit Judge.

This case comes before us for decision as four consolidated appeals. In No. 78–1732 the defendant, Frank Walus, appeals from the judgment of the district court cancelling his Certificate of Naturalization. The other appeals, Nos. 79–1140, 79–1587, and 79–1629, are from two orders of the district court denying motions under Fed.R.Civ.P. 60(b)(2) to vacate the judgment based on newly-discovered evidence and a motion for letters rogatory under Fed.R.Civ.P. 28(b)(3).[1]

In January 1977, the Government filed a four-count complaint against Walus seeking to revoke his United States citizenship under 8 U.S.C. § 1451(a). The basis for the Government's action was Walus' alleged membership in the German Gestapo, Schutzstaffeln (SS), or other similar organization, the commission of atrocities in Kielce and Czestochowa, Poland, and failure to disclose these facts during the naturalization process.[2] The defendant was tried on these charges without a jury. The trial court found against the defendant on each count and entered judgment in favor of the Government. *United States v. Walus*, 453 F.Supp. 699 (N.D.Ill.1978).

In summary, the following evidence was submitted at trial. The Government's case-in-chief consisted primarily of the testimony of twelve witnesses who said they saw the defendant commit various acts of brutality during the Nazi occupation of the Polish towns of Kielce and Czestochowa.[3] According to the witnesses the defendant was a member of the Gestapo. The Government's evidence also included testimony concerning admissions made by Walus to his neighbors and two of his coworkers about his activities during World War II. In his defense, Walus testified that he was a forced laborer in Germany during the years in question. Walus testified that the Germans sent him from his home in Fanislawice, Poland to Germany when he was seventeen years old and that he worked for farmers in Kleinkotz, Bubenhausen, and Wullenstetten, Germany.[4] To corroborate his testimony, Walus submitted, among other things, documentary evidence, including public health insurance records that placed him in the employ of these farmers during this period. Five witnesses also testified that they knew Walus when he was a laborer in these German towns. After hearing all of the evidence, the trial court concluded that "in the face of the case presented by the United States, it [simply] cannot accept what was essentially an alibi defense by Frank Walus." 453 F.Supp. at 715. The judgment was entered on May 30, 1978.

After the entry of judgment revoking his citizenship, Walus filed two motions to vacate under Fed.R.Civ.P. 60(b). Both of these motions were based on newly-discovered evidence. The first motion was filed on October 30, 1978. The evidence supporting this motion included documents, witnesses, and evidence of SS and Gestapo

---

1. This court heard oral argument on April 26, 1979 only in Nos. 78–1732, the direct appeal, and 79–1140, the first 60(b)(2) motion. Since that date, however, the defendant's appeals from the denial of his second 60(b)(2) motion and denial of his motion for letters rogatory, Nos. 79–1587 and 79–1629, have been joined, pursuant to an order of this court dated June 19, 1979, for consideration by the same panel without oral argument.

2. Specifically, Count I charges that the defendant concealed a material fact on his Naturalization Form N–400, namely, that he had committed crimes "against civilians in Czestochowa and/or Kielce, Poland at various times during the years 1939 through 1943."

    Count II charges the defendant with concealing his membership in the SS, Gestapo, or other such organization, between 1939 and 1943 in filing his form N–400.

    Count III charges that the defendant lacked the good moral character required for naturalization, having committed atrocities in Kielce and Czestochowa between 1939 and 1943.

    Finally, Count IV charges that, in seeking naturalization, the defendant gave false testimony under oath as to the commission of war crimes and membership in the Gestapo and SS and therefore lacked the good moral character required for citizenship.

3. These towns are approximately sixty miles apart.

4. The German towns are all within a few miles of each other but are at least seven or eight hundred miles from the towns in Poland.

admission requirements. The first item at issue was a pair of documents from the State Archive Neuberg on the Danube. One of these documents is an application for a residence permit dated June 16, 1940. The other document, dated August 31, 1940 is a residence permit. On one of the documents is a photograph. The information recorded on both documents places the defendant in Kleinkotz, Germany from March 7, 1940, to June 4, 1940, and in Bubenhausen from June 4, 1940, to an indefinite date. The affidavits of three witnesses also accompany the Rule 60(b)(2) motion. One of the affidavits comes from a French citizen who claims to have been a prisoner of war and to have known Walus at Wullenstetten, Germany from 1941 to 1945. Another comes from a priest who claims to have known Walus at Wullenstetten from January 1, 1942, until the end of April 1945. The third affidavit comes from a factory worker in Germany who claims to have been brought to Wullenstetten, Germany, from Poland as a forced laborer in 1941, and who claims to have known Walus in Germany. This affidavit is accompanied by four photographs, which the witness claims show him with Walus and other forced laborers. Finally, the defendant has offered statements from the German Institut fur Zeitgeschichte asserting that Poles were not admitted in the Gestapo or SS and evidence as to height requirements for these organizations. Walus' second Rule 60(b) motion is based on the affidavits of five Polish citizens who also claim to have known Walus when he was a forced laborer in Germany. The district court denied both of these motions.[5]

In his direct appeal from the judgment revoking his United States citizenship, Walus has raised numerous issues, most notably, the sufficiency of the evidence and the bias of the judge at trial. Although our reading of the record has revealed instances of attitudes we find somewhat disturbing on the part of this experienced trial judge,[6]

---

5. Having denied the Rule 60(b) motions, the district court also denied the defendant's motion for the issuance of letters rogatory which sought access to the files of the Polish War Crimes Commission. According to the defendant the Commission has investigated the allegations at issue here.

6. The defendant has emphasized one instance when the trial judge repeatedly demanded that the defendant's attorney define "Gestapo," although the word appeared in the complaint and had already been used many times in the course of direct examination of the Government's witnesses. The court persisted in this questioning despite the efforts of the Government attorney, as well as the defense attorney, to answer. We quote only an excerpt of the several colloquies on this subject:

> The Court: Since you have gotten that kind of an answer every time you have described an individual as a Gestapo officer, please tell me, because I don't know what a Gestapo officer is, so that I can better understand the testimony of the witness. I am the trier of the facts here in the absence of a jury. Just what is Gestapo, what does the term Gestapo officer mean?
> Defense Attorney: Well, I thought the witness testified on direct examination—
> The Court: That isn't what I am asking you now. What do you mean by it, because I don't know.
> Defense Attorney: I am talking about a person in the same military unit as allegedly the defendant was in . . . . I don't purport to be an expert on the subject, but I don't believe that the SS and the Gestapo are interchangeable.
> The Court: Well, which country was he serving? I just don't know. We have, many people have come into these courtrooms with different color uniforms, but I cannot identify them and Gestapo, I am satisfied, is not an English word. We conduct trials in the United States Courts in English and I think I have a right as the trier of facts to know what the word means.
>
> \* \* \* \* \* \*
>
> Defense Attorney: Well, I will ask the witness to explain to the Court—
> The Court: No, you won't before you tell me what you mean. Otherwise I shall not permit you to ask a question including that word.
> Defense Attorney: . . . [I]t was analogous to the German civilian police. It was a secret police, a civilian organization as opposed to a paramilitary organization.
> The Court: That does not define the word to me, analogous. Analogous means like or not unlike.
>
> \* \* \* \* \* \*
>
> Now, if you don't know what it means or are unwilling to define it, please do not use it again until you know what it means.
>
> \* \* \* \* \* \*
>
> The Government: Your Honor, could I suggest that you have raised an interesting

the entire record and the ultimate findings do not sufficiently support the defendant's extraordinary charge of bias so as to require reversal on this ground. Furthermore, we have reviewed all of the evidence and have concluded that, although the defendant's argument that the evidence is insufficient is persuasively presented, outright reversal is not otherwise warranted. We do agree with the defendant's arguments under Fed.R.Civ.P. 60(b), however, that the Government's case was sufficiently weak, particularly as to impeachment of the defendant's documentary evidence, that the newly-discovered evidence would almost certainly compel a different result in the event of a new trial. We therefore reverse

the district court's denial of the defendant's Rule 60(b) motions on the basis of the newly-discovered witness from France, the newly-discovered residency documents from the State Archive Neuberg on the Danube, and the five newly-discovered witnesses from Poland.

■ Both parties agree that the prerequisites for relief from the judgment under Rule 60(b)(2) are as follows:

(1) The evidence was discovered following the trial;

(2) due diligence on the part of the movant to discover the new evidence is shown or may be inferred;

(3) the evidence is not merely cumulative or impeaching;

point. I am confident that we could get a stipulation as to what a Gestapo officer is.

\* \* \* \* \* \*

. . . What I am wondering is, in light of the time of the day, it might be well to defer this because if your Honor posed that particular question to me, I wouldn't know the answer.

The Court: Well, I will be glad to accept your reminder that it is time to recess, but not until counsel answers my question. If he says that he cannot answer it or doesn't want to answer it, that will be quite all right. I will recess.

The Government: Fine, your Honor.

The Court: But I am accustomed to having lawyers answer my questions.

Defense Attorney: Your Honor, as I stated before, I am not an expert on the subject.

\* \* \* \* \* \*

The Court: . . . [Y]ou have used the word four or five times. You do not have to be an expert to use it.

Defense Attorney: I have used the term because the witness stated that he worked in a Gestapo headquarters. . . .

The Court: I haven't asked you a thing about the witness. I am asking you about the meaning of your question. I repeat to you, sir, I am a trier of the facts and I must find the facts. It is my obligation here. It will be my obligation ultimately to determine what the facts of this case are.

Now, if you are unwilling to tell me what you mean by the word "gestapo," that will be quite all right, but I note that fact on the record.

Defense Attorney: I am not so unwilling, your Honor.

The Court: But since I don't know what it means and you are unwilling to tell me, I now forbid you to use the word in interrogating the witness.

Defense Attorney: Will your Honor allow me to determine whether or not the witness can distinguish a Gestapo from another—

The Court: No, no. We speak English in the Courts of the United States unless the witness cannot understand or speak English and for that purpose we have an interpreter. Now, maybe I need an interpreter to tell me what that means, but you are using it and a lawyer admitted to practice in the District Courts of the United States certainly ought not to use a word he doesn't know the meaning of or is unwilling to tell the Court the meaning of.

Defense Attorney: Your Honor, I have attempted to tell the Court my understanding of the word Gestapo.

The Court: No, you haven't attempted at all. You tell me what the word means in your opinion. Maybe you don't know. If you don't know, you may state that you don't know.

Defense Attorney: It was the civilian German police, the branch thereof being the security police, what is commonly known as a secret police for the protection of state security. That was the Gestapo. It originally started out as a Prussian police arm when the states of Germany were unified. After Hitler came to power, the role of running the Gestapo was given to Heinrich Himmler and Himmler applied—

The Court: I don't want any examples.

\* \* \* \* \* \*

The Government: Well, we will accept Mr. Korenkiewicz' definition as generally covering Gestapo.

The Court: If you are willing to accept his definition—

The Government: We are, your Honor.

The Court: That will be quite all right.

(4) the evidence is material;

(5) the evidence is such that a new trial would probably produce a new result.

See *Ag Pro, Inc. v. Sakraida,* 512 F.2d 141, 143 (5th Cir. 1975), *rev'd on other grounds,* 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Giordano v. McCartney,* 385 F.2d 154, 155 (3d Cir. 1967).[7] Our review is confined to a determination whether the district court abused its discretion in applying this standard. *De Filippis v. United States,* 567 F.2d 341 (7th Cir. 1977); *International Nikoh Corp. v. H. K. Porter Co.,* 374 F.2d 82 (7th Cir. 1967).

■ In denying the defendant's motions for relief under Rule 60(b), the district court adhered to its earlier determination that the evidence against the defendant at trial was compelling and therefore concluded that the new evidence was not of the quality that justifies vacating the judgment. The strength or weakness of the evidence against the defendant is an important and often decisive factor in judging the new evidence supporting a motion to vacate, because the fundamental purpose of the Rule 60(b) motion is to prevent the judgment from becoming a vehicle of injustice. *Compare Newsom v. United States,* 311 F.2d 74 (5th Cir. 1962) *with United States v. Beduna,* 359 F.2d 147 (6th Cir. 1966). *See generally* 2 C. Wright, Federal Practice & Procedure § 557 (1969). The result of this action would be to strip the defendant of what is perhaps his most precious possession, his American citizenship. Accordingly, there is no dispute that section 1451(a) requires the Government to prove its allegations against the defendant by clear, convincing, and unequivocal evidence. *See, e. g., Schneiderman v. United States,* 320 U.S. 118, 125, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943); *United States v. De Lucia,* 256 F.2d 487 (7th Cir. 1958), *cert. denied,* 358 U.S. 836, 79 S.Ct. 59, 3 L.Ed.2d 72. We therefore turn first to an examination of

the record at trial, keeping in mind the Government's heavy burden of proof and our fundamental duty to ensure that the judgment below speaks the truth. *See Newsom v. United States, supra,* 311 F.2d at 79. Only then can we properly review the decision of the district court that the new evidence is not of the quality to entitle the defendant to relief from the judgment.

### *The Evidence at Trial*

1. The Government's Case

The bulk of the Government's case against the defendant was the testimony of twelve witnesses who identified Frank Walus as the perpetrator of crimes against civilians in the ghettos of Czestochowa and Kielce, Poland, between 1939 and 1943. Ten of the witnesses, David Gelbhauer, Josef Koenigsberg, Moniek Rozanski, Elieser Gliklich, Chaim Beigelman, Beinisz Neuhaus, Isaac Sternberg, Anna Kremski, Frank Silver, and Simon Mlodinow, were confined to the Jewish ghetto in Czestochowa. Two of the witness, Meylich Rozenwald and Sara Leichter, were confined to the ghetto in Kielce. Each of the persons testified to having witnessed horrible crimes committed against their people by one particular member of the Nazi Gestapo. According to the witness Gelbhauer, for example, this man beat people during interrogation sessions until they were bloody and had to be carried from the room. The witness Gliklich testified that he saw the man club people, including Gliklich's father, at the Gestapo headquarters. The witness Leichter testified that she saw the man lead a group of young children into a building and that she then heard gunshots and screaming.[8] Ten of these witnesses identified the defendant in court as the perpetrator of the crimes.

The district court gave the following reasons for crediting the testimony of these witnesses:

we have also looked to cases applying this rule for guidance in reaching our decision.

---

7. We note that the same exacting requirements apply for a new criminal trial based on newly-discovered evidence under Fed.R.Crim.P. 33. *See, e. g., United States v. Ellison,* 557 F.2d 128, 133 n.2 (7th Cir. 1977), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450. Accordingly,

8. A complete description of the atrocities appears in the district court's opinion. *See* 453 F.Supp. at 710–12.

These witnesses' identifications of this defendant as the individual who committed these actions included positive recognition of him in photographic displays, recollection of his name and certain physical characteristics (primarily his general build and height), and in-court identifications. Their testimony was powerful and convincing; it was also, to a high degree, consistent among the witnesses.

453 F.Supp. at 704. The district court also characterized the eyewitness testimony as "largely unshaken by able cross-examination." *Id.* at 714.

We agree with the district court that the passage of so many years between the viewing of the crimes and the trial does not in itself constitute grounds for discrediting the testimony. *See Neil v. Biggers,* 409 U.S. 188, 201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Many of the witnesses explained their ability to identify the defendant after so many years as the result of the enormity of the crimes. *See id.* at 200, 93 S.Ct. at 382–383 (noting that the witness, a rape victim, was "no casual observer, but rather the victim of one of the most personally humiliating of all crimes"). Anna Kremski testified, for example, that she could identify "Just his type of face, the eyes and this part of the face. I can't forget. I was in terror." Similarly, Moniek Rozanski testified, "I saw him prior to this incident at the Gestapo, but I didn't pay as much attention to him 'til that day or this incident which remains in my heart and in my memory and I can't forget it." The witnesses described the perpetrator of the atrocities as a man in his early twenties. Walus would have been about that age at the time.[9] Three witnesses also testified that the man they saw was, like Walus, able to speak both Polish and German. Some witnesses testified that they heard him called either the name "Frank Walus" [10] or "Walus Frank." [11] The

---

9. Walus was born on July 29, 1922. He therefore would have been between seventeen and twenty-one years of age during the years 1939 through 1943.

10. Even when specifically questioned on the issue, none of the witnesses identified the perpetrator of the crimes as "Franz," "Franzl," or "Franciszek." The defendant attempted to impeach the identification testimony with linguistic evidence that would show that he could not possibly have been known by the name "Frank." The defendant was born in Germany, his parents were Polish citizens, and his name at birth was Franz. The defendant was raised a Catholic. According to the defendant's testimony, he was called "Franciszek" after he moved to Poland as a boy. Based on these facts, a linguist from the University of Chicago testified that a German would have called the defendant "Franz," "Franzl," or "Fraenzl," but not "Frank." According to this witness, the name "Frank" would occur only "sporadically" as a first name but quite commonly as a last name. Furthermore, the expert testified that "Frank" is more often borne by Protestants than Catholics. Finally, the expert testified that "Frank" is never a German nickname for the name "Franz."

In its findings, the district court disregarded this testimony as "not helpful to this court in deciding this case." 453 F.Supp. at 707. We are more inclined to regard this testimony as casting some doubt on the identification testimony of those witnesses who insisted that the perpetrator was called by the first name "Frank," particularly in light of the suggestive pretrial identification procedures, which are discussed *infra*. Most questionable, however, was the trial court's reason for disregarding the testimony, which we have gleaned from the following passages from the transcript:

The Court: Professor, suppose that very person who has been identified as the defendant in this case, sitting at the table over there now, came to the United States of America and came to be known to many people as Frank Walus. Does that information lead you to believe that he could not be one and the same person described to you by counsel for the defendant who is now interrogating you?

The Witness: It is a complicated question. If I can take some time to answer, I will do my best to do it.

The Court: I do not think it is complicated. You can take your time.

The Witness: The name Frank is the recognized English version of both the German name Franz and the Polish name Franciszek. However, the German name Frank is not a German version of the German name Franz, nor is it a German version of the Polish name Franciszek.

A person who immigrates to this country bearing the German name Franz would in all likelihood be called Frank in this country. If he subsequently went back to Germany or a German-speaking part of Europe he might very well then be called Frank.

But never having been in the United States, it is highly unlikely, though not impossible, for someone whose given German name is

11. See note 11 on p. 290.

trial court also credited the eyewitness testimony because of the generally consistent identification of the perpetrator of the crime as a man of Walus' height and build. According to the trial court, the variations between the witnesses' identifications can be explained by

> the fact that the defendant was viewed on numerous occasions in uniform. To several people, a person in uniform, especially one in Gestapo dress, unavoidably takes on a more imposing, and thus somewhat larger and more mature appearance.

453 F.Supp. at 714.[12]

Although the record supports the district court's description of the eyewitness testimony, the record also suggests that the strength of the Government's case is at least partly the result of the trial court's frustration of defense attempts to cross-examine the witnesses.

> Franz to be referred to by German-speaking people as Frank.
> The Court: As Frank?
> The Witness: Well the pronunciation Frank is quite impossible in Germany. He would either be called Frank perhaps or Frank. [We assume there were differing pronunciations.]
> The Court: Well, I have to pronounce it that way, because I am obligated to conduct trials here in the English language in the United States Courts.
> Well, suppose this man Walus has in his pleadings . . . signs the pleading by his lawyer as Frank Walus. . . .
> And he admits certain allegations in the complaint and he admits them as the defendant Frank Walus, also known as Franciszek Walus.
> . . . [D]oes that in any way alter or lead you to want to alter your answer to my question?
> The Witness: No, I do not think so. As I said before the name Frank is an English version.
> The Court: Well, we conduct trials here in English.
> The Witness: Right.
> The Court: If we did not, we would have to conduct trials in the language of every litigant, and I do not think we would have lawyers enough in the United States who would be qualified to sit as trial judge and understand all of those languages.
> The Witness: Well—
> The Court: I am not trying to embarrass you.

It is obvious that one of the major goals of defense cross-examination of the eyewitnesses was to show that their memories of the man who committed the crimes had blurred over thirty-five years.[13] The record shows that the district court often restricted questioning on the subject of the perpetrator's resemblance to the defendant or expressly accorded no significance to the answers given. During the cross-examination of the witness Keonigsberg, for example, the defense asked about Koenigsberg's memory of scars or other identifying marks. The trial court interrupted the answer with this exchange with the defendant's counsel:

> The Court: Certainly there is no foundation for asking that kind of a question. You asked this witness whether he had any scars on any part of his body. Now, if you were to ask him if he ever saw him without any clothes on, you would be laying a foundation.

> The Witness: If I could just reiterate my point.
> My point is that in a German-speaking country a person named Franz would not be called Frank or Frank. In an English-speaking country he would.
> The Court: He would be known as Frank.
> The Witness: In an English-speaking country, yes.
> The Court: Well, you concede that the United States of America is English-speaking.
> The Witness: Oh, yes.
> The Court: You do not have to be a professor of linguistics—
> The Witness: No, I concede completely that a person named Franz would in all likelihood be called Frank in an English-speaking country, including the United States.
> The Court: You have answered my question.

**11.** A few of the witnesses testified that they heard the man who committed the crimes called "Wacusz," "Waclaw," or "Wacek."

**12.** In this way, the trial court's findings explain the difference between Walus' actual height, which he claims is 5′ 4″ by recent measurement, and his slender build, depicted in the defendant's Exhibit 38, a photograph of the defendant in his mid-twenties, and the description by some of the witnesses of the perpetrator as "average" or "medium" height and build.

**13.** This questioning would also have been helpful in probing the suggestiveness of the identification procedures, an issue which we discuss *infra*.

Defense Attorney: Your Honor, I specifically asked—

The Court: Let's not waste our time.

Defense Attorney: Judge, I don't want to waste your time.

The Court: He has answered it. You may continue, but I interpose this observation because I think it is an absurd question to ask a man whether he ever saw a scar on any part of his body when he hasn't testified that he has seen him— had seen him with no clothes on.

Defense Attorney: Your Honor, I specifically stated on any part of his body that the witness could see.

The Court: Well, you didn't say—

Defense Attorney: I thought I did. If I did not, I apologize to the Court.

The Court: I think it is unfair to the witness. I don't know whether you have any scars on your body or not. From here, I cannot even see whether you have any on your face. Continue with the examination. Try to ask some questions that will help us decide the issues here.[14]

The defendant also asked the witness Koenigsberg whether he could describe the voice of the man who committed the crimes, eliciting the following response from the trial court:

> The Court: Well perhaps you want to know whether it was soprano, tenor, baritone, base [sic]. If you were to ask me what kind of a voice you have, I would say on occasions I don't hear you, but that I couldn't answer it otherwise.
>
> Defense Attorney: Well, I wouldn't be asking—

14. A similar exchange occurred during cross-examination of the witness Gelbhauer, although the defense did elicit testimony about the witness' unwillingness even to look at the man who committed the crimes at Czestochowa:

> Defense Attorney: You didn't like to look at Mr. Walus or the man you identified as being Mr. Walus?
> The Witness: No.
> Defense Attorney: Did the man you identified as Mr. Walus have any scars on his face or on any part of his body that you could see?
> The Interpreter: Do you mean now or then?
> Defense Attorney: During the time you knew him in Czestochowa.

The Court: I think that exceeds the limits, a question like that, of a fair cross examination. The meaning of the question isn't clear to a lay witness.

Defense Attorney: Your Honor, if the question could be read back, I asked, when I said to describe the voice, I said was it a high-pitched voice or a husky voice? This is, you know, the central issue in this case is the identification. The witness testified that he heard this person speak. The question goes to whether or not he can recall the type of voice this person had.

The Court: I think this is an unfair question. Nevertheless, I will let him answer if he can.

Because of the defendant's small stature, the defense also attempted to show failure of recollection on what well could have been his most distinguishing feature. Questioning on this subject, however, met with a similarly poor reception from the trial court. During the questioning of the witness Rozanski, for example, the following exchange occurred:

> Defense Attorney: Mr. Rozanski, before you identified the defendant in this case as the very same man you knew in Czestochowa, you didn't see him standing up, did you?
> Witness: No.
> Defense Attorney: So when you made that identification this morning, the only view you had of this defendant was from his stomach upward, isn't that a fact?
> Witness: Yes.

The Court: Before I permit the witness to answer that question, I am here to supervise questions. There is no evidence that the man who was being looked at was undressed. You asked him whether he had any scars on any part of his body.

    *    *    *    *    *    *

Defense Attorney: No, your Honor. I asked on his face or any part of his body that he could see.

The Court: That he could see?

    *    *    *    *    *    *

I will let him answer that question.

By The Witness: I wouldn't look at him. I tried not to see him. I tried to avoid him as much as one avoids a dog.

The Court: Are you suggesting that this witness could see his stomach?

Defense Attorney: I asked if he could only see the man from his stomach up. No, I am not suggesting that he could see his stomach.

The Court: That is what you said.

Defense Attorney: I thought it might be interesting in this case, since the crucial issue is identification, that we explore the area of identification.

The Court: How can a man see his stomach, either standing or sitting? Let's get down to questions that are of interest here.

\*     \*     \*     \*     \*     \*

Defense Attorney: If these questions are not of interest, then I will move on.

The Court: How can a man's stomach be seen, either standing or sitting, without X-ray or some other instrument?

\*     \*     \*     \*     \*     \*

Please ask the next question if you have one, sir.

Similarly, during the questioning of the witness Gelbhauer, defense counsel asked:

Q And in relation to yourself, Mr. Gelbhauer, how tall is this man you identified as Mr. Walus?

A I really didn't measure him against myself. I know he is a bit taller than I am.

Q Mr. Gelbhauer, can you be more specific and tell us approximately how much taller he was than you?

The Government: I object, your Honor. I think the question has been asked and answered.

The Court: I sustain the objection.

Defense Attorney: On what grounds, your Honor? I believe he—

\*     \*     \*     \*     \*     \*

He stated that the witness was somewhat taller.

The Court: Oh, I think it is an absurdity. You have been with me all morning and one hour and a half in the afternoon. I couldn't tell you, and probably I have a little better education than the witness, but I couldn't tell you how much taller you are than I or how much taller I am than you. I don't know that you are even taller than I am.

Defense Attorney: But this witness—

The Court: That is an absurd question. I sustain the objection to it. ·

The frustration of this crucial subject of cross-examination is most disturbing, however, in light of the procedures by which most of the witnesses originally identified the defendant as the perpetrator of the crimes.[15] Eight of the twelve eyewitnesses first viewed a picture of the defendant in a photographic spread, known as Government's Exhibit 1.[16] The photograph of Walus in this spread shows only his face and

---

**15.** In his direct appeal the defendant does not argue that the pretrial identification procedures were so suggestive as to make admission of the witnesses' identifications at the trial a violation of due process, an argument which has been considered by the Supreme Court in the context of criminal jury trials. *See, e. g., Manson v. Braithwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The defendant does argue that the totality of the circumstances surrounding the identifications does not justify the district court's reliance on these identifications in light of the suggestiveness of the pretrial identification procedures. *See Neil v. Biggers, supra,* 409 U.S. at 199, 93 S.Ct. at 382. *Neil* requires that, in criminal cases, the corrupting influence

of the suggestive procedures be balanced against (1) the opportunity of the witness to view; (2) the degree of attention; (3) the accuracy of the description; (4) the witness' level of certainty; and (5) the time between the crime and the confrontation. *See also Manson v. Braithwaite,* 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–2253, 53 L.Ed.2d 140 (1977). Even outside the context of due process challenges to admissibility, however, we must determine the probative value of this evidence with the same caution, carefully weighing each of these factors.

**16.** The witnesses who viewed Exhibit 1 were David Gelbhauer, Josef Koenigsberg, Meylich Rozenwald, Moniek Rozanski, Elieser Gliklich, Chaim Beigelman, Anna Kremski, and Sara Leichter.

apparently is an enlargement of another photograph which appears in another document in the record.[17] The enlargement is light and grainy in appearance and shows little shading of the defendant's facial features. In fact, the left outline of the defendant's face is barely visible. Other photographs in the spread are of much poorer quality; others are of better quality. The photograph used for the enlargement was taken in 1959, when the defendant was thirty-seven years old, almost twenty years after the events at issue took place. In its findings of fact, the trial court, based on its observation of the defendant in court, concluded that the witnesses could make positive identifications from the photo display. Furthermore, the witnesses generally characterized the photograph as showing someone at least "a little bit" older than the perpetrator of the crimes.[18] The long time span between the incidents and the viewings of this exhibit in the mid-1970's would itself require scrutiny of the identifications, even if they were made under "laboratory conditions." *Cf. Neil v. Biggers*, 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972) (lapse of seven months between incident and confrontation would be "seriously negative factor in most cases"). Generally, the circumstances surrounding the showing of Government Exhibit 1, however, can hardly be described as "laboratory" in nature. The witnesses Koenigsberg and Rozanski, for example, responded to an ad in an Israeli newspaper seeking witnesses. The ad mentioned the name Frank Walus, the town Czestochowa or Kielce, and the commission of war crimes. The witnesses Gelbhauer, Rozenwald, and Gliklich were called by an Israeli police inspector on the telephone. The inspector mentioned Czestochowa to Gelbhauer and Gliklich and the name Frank Walus to Gliklich and Rozenwald. Gelbhauer denied having been told any names.[19] The witness Kremski first saw Government Exhibit 1 at a booth in the lobby of the Florida Hotel in Tel Aviv. She recounted her original viewing in this way:

A The year I really don't remember. It was in Israel. I was staying in a hotel in Israel, it is called the Florida Hotel.

Q Is that in Tel Aviv?

A Tel Aviv. I came into the lobby. I saw some friends from Czestochowa sitting in the lobby by a table with some people, which I did not know. Walking in, as I went to walk over to the table, they said to somebody, to those people, "This lady is from Czestochowa, she lives in America."

I introduced myself, hello. I sat down and they asked me. "Are you born in Czestochowa?" I says "Yes."

"Do you know a man of this name, Walus," whatever you call it, and I says, "No."

Sitting, they showed me pictures, individual pictures, spread out, about eight or nine. I don't remember. I looked for a while. Then I took my glasses, I looked again and this face struck me. I says, "I

---

17. The photograph also appears on the defendant's 1959 Immigrant Visa and Alien Registration, Government Exhibit 6.

18. The trial court did not seem at all inclined to consider the passage of time as a basis for questioning identification of the 1959 photo in Government's Exhibit 1, as is evident from this comment during the defendant's argument for a directed verdict:

The Court: On that subject all the photographs, and in anticipation of hearing this argument this morning and anticipating more especially that you might question whether or not these photographs assisted the witnesses in their clear identification of the defendant, I got out at home pictures of myself and other people on the occasion of my in-

duction as a Judge of the State Court. I was a judge there before I came here.
Defense Attorney: I am aware of that fact.
The Court: As you may know.

I wanted to see how I looked that many years ago and it was more years than I care to proclaim to an audience as large as this one. It is remarkable how much I look today as I did then, even though the curl is now out of my hair.
Defense Attorney: Out of a lot of our hair.
The Court: Those are pretty good pictures of your client, in my opinion, and, of course, I think I was—he was a little better looking in those days. Time has a way of dealing with good looks.

19. Gelbhauer did testify at a deposition, however, that he was told the Walus name.

know this face, I know this man. With this man, I had the incident," and I pointed out the picture and that is all. I had to go away, I said goodby.

The witness Rozenwald said he was shown Government Exhibit 1 and was unable to identify any photograph as the defendant. The Israeli inspector conducting the interview then showed Rozenwald only the defendant's photograph and Rozenwald was still unable to identify the defendant. Finally, the inspector told Rozenwald that Frank Walus was the person pictured in that photograph. Rozenwald never identified the photograph, but did identify the defendant in court.[20]

Review of the district court's findings, to the extent that they are based on the testimony of these eight witnesses, is difficult because the court gave little separate consideration to the possible effects of these procedures on each witness' identification of the defendant.[21] As the Government has emphasized in its brief, the witnesses were positive about their identification of the defendant and they consistently explained their ability to recognize him as the result of their terror of the man who committed the crimes. We are nevertheless troubled by the rather superficial consideration below of the potential effect of the questionable photographic identification of the defendant and its effect on the in-court identifications. Perhaps doubt would be allayed

had the trial court been more receptive to the exploration of specific similarities or differences between Walus and the perpetrator of the crimes. As it stands, however, the record shows that at least five witnesses, Gelbhauer, Koenigsberg, Rozanski, Gliklich and Kremski, all of whom originally viewed Government Exhibit 1, relied generally on Walus' face and little else as the reason for identifying the defendant. Cf. Neil, supra, 409 U.S. at 200, 93 S.Ct. at 383 (witness description, after seven months, of assailant's approximate age, height, weight, complexion, skin texture, build, and voice, "might not have satisfied Proust but was more than ordinarily thorough").

■ Finally, the Government presented evidence of Walus' admissions through the testimony of four witnesses. Two of these witnesses were co-workers of Walus with whom he spoke frequently. Both testified that Walus said he had been an inmate of a concentration camp and was forced by the Nazis to run naked in the snow. Walus also allegedly told these witnesses that he was tricked by the Nazis into turning on the gas chambers and murdering "his people." Walus has argued that these admissions bear no relation to the charges in the complaint and therefore should not have been admitted. The Government correctly points out that Walus mentioned being a sergeant in the German Army to one of these witnesses[22] and relates this admission to the

---

**20.** The witness Neuhaus, who testified to the same event as the witness Beigelman, identified the defendant neither in the photograph nor in court.

We also mention only briefly that the photographic identifications made by the witnesses Silver and Sternberg are less questionable because the photographs used in Government Exhibits 8 and 9 were considerably clearer than the photograph in Exhibit 1. (Government Exhibit 8 contains an unenlarged version of the photograph in Exhibit 1. Government Exhibit 9 contains a different photograph, also taken in 1959.) Simon Mlodinow identified Government Exhibit 10, which also contains a 1959 photograph of the defendant. This witness, however, also testified to recognizing Walus on an "El" train in Chicago prior to any identification of the photograph.

**21.** In one specific incident, the court did consider the credibility of Rozenwald to be "aug-

mented" by his refusal to identify Walus from the photographic display, 453 F.Supp. at 714. Certainly this was the reasoning of the Supreme Court in Neil, supra:

There was, to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases. Here, however, the testimony is undisputed that the victim made no previous identification at any of the showups, lineups, or photographic showings. Her record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres in a showup.

409 U.S. at 201, 93 S.Ct. at 382.

**22.** The Government claims both witnesses so testified, but the record does not support this assertion. The witness Zapart said Walus claimed membership in the Polish, British, and American armies, not the German Army.

charge on the basis of other evidence that contract workers for the Gestapo were given the ostensible rank of sergeant in the German Army. The admissions, however, are devoid of dates and locations and do not directly corroborate the other evidence.[23] Nevertheless, this case was not tried before a jury, and the district court's findings mention these admissions only briefly. Any error in admitting them was therefore harmless.

In contrast, the admissions contained in the testimony of Michael and Theresa Alper related more closely to the charges in the complaint.[24] The trial court, after observing these witnesses, believed their testimony, although the defense showed that Alper, known by Walus to be a Jew whose parents were killed by Nazis during the war, continued to live on friendly terms as a boarder in Walus' house after Walus made these alleged statements. Alper lived with Walus from 1971 to May 1973. Alper also brought his new wife, Theresa, to live at Walus' house in March 1973, despite Walus' alleged admissions. Alper did testify that just before he left Walus' home, Walus accused him of cheating another man of $1,000. After Alper left, Walus told his neighbors things that hurt Alper's reputation, and abused and threatened Alper and his wife on the street. Furthermore, the Alpers admitted that they never reported Walus' alleged statements to anyone until 1974, after the apparently bitter relations developed.

We recognize that the Alpers denied having any hatred toward the defendant. Michael Alper explained his remaining at the Walus home for so long as the result of his having nowhere else to go and his friendship for Walus' wife and family. Nevertheless, we have difficulty with the trial court's credibility findings as to these witnesses. The evidence of hatred between the defendant and the Alpers was extremely strong; yet the district court considered the testimony not only believable, but critical to the Government's case. 453 F.Supp. at 714. Perhaps we would have less difficulty with the trial judge's findings were it not for the unrestrained and almost irreconcilable reliance on bias in impeaching Walus' witnesses, a subject we discuss *infra*.

2. Walus' Alibi Defense

Frank Walus testified in his defense. Walus testified that he was born in Germany on July 29, 1922, and lived there with his parents, who were Polish citizens, until 1932, when his father died. In his early years he learned to speak German. In 1932, Walus' mother brought the children to her home in Fanislawice, Poland, which is near Kielce. Walus testified that he remained in Fanislawice until March 1940, although he occasionally lived and worked on neighboring farms. When the Germans invaded Poland in 1939, Walus returned to Fanislawice from nearby Pawel Wilka, where he was working on his uncle's farm. Walus said he remained in Fanislawice until March 2, 1940 when he was shipped to Germany with oth-

23. In its brief the Government advances a theory of relevance that strains credulity. According to the Government, this evidence really created sympathy for the defendant:

The statements of Mr. Walus describing the process by which he became a member or functionary of the Gestapo are most tragic. The pity felt for Mr. Walus for the sufferings he endured in this initial period of conversion to the side of the Gestapo is, however, quickly . . . erased by a review of Mr. Walus' acts after the process of change was completed. Once converted to the German cause Mr. Walus became a vicious initiator and perpetrator of assaults, murders, and atrocities on fellow human beings, simply because those other humans were Jewish.

The Government's "conversion" theory is not borne out by the admission testimony, which carries no reference to the time or place of the events. Furthermore, the Government has offered no support whatsoever in the record for its questionable assertion that the Gestapo found faithful recruits among the inmates of the concentration camps.

24. According to these witnesses, Walus admitted being in Kielce, Radom, and Czestochowa, Poland until 1943 when he was sent to Germany to spy on slave laborers near Ulm. The testimony described horrible crimes of violence and random killings.

er young people from his village to work as a forced laborer.

According to Walus, he worked as a laborer on the farm of Karl and Viktoria Ritter in Kleinkotz, Germany, from early March 1940 to June 5, 1940. The Ritters sent him back to the labor office because he was too small and weak for the work. Walus said that in June 1940 he was sent to the farm of August and Maria Zeller in Bubenhausen. Walus claimed that while working at this farm, he escaped, fled as far as Munich, was captured, and returned within three days. He was punished for this attempt with a twenty Reichmark fine. Again because he was too weak for the work, the Zellers returned him to the labor office in May 1941.

Walus testified that he was next assigned to the farm of Ludwig Stolz in Wullenstetten where he remained until January 1, 1942. His last assignment lasted from January 1942 to June 1945, when he worked on the farm of Fritz and Walburga Welte, also in Wullenstetten. He then joined the Allied forces. After the Americans came, Walus joined the 8th British Corps, that is, the Second Polish Army in Italy. In early 1946, he was assigned to guard American bases as a member of the Civil Guard in Regensburg. Walus then returned to Poland and resided in Kielce from 1947 through 1957.[25] Walus also claimed that, during the war, SS and German police officers visited the Welte farm and unsuccessfully attempted to persuade him to join the German cause.

The Government offered certain prior statements given by the defendant under oath as impeachment of the account of his war time activities given in court. The statements appeared in three Government Exhibits: Walus' 1959 Application for Immigrant Visa and Alien Registration; Walus' 1962 Immigrant Visa; and Walus' 1970 Application to File a Petition for Naturalization.

In the 1959 application, Walus listed as "Places of previous residence" the following: "—1937 Swietochow/Polen,—Warszawa/Polen 1938–39 Gorss Pewel/Polen—1945 Wullenstetten/Neu Ulm, Germany." The 1962 Visa contains a list of Walus' residences from age 16. Neither Fanislawice nor Kielce is listed as a residence during the late 1930's. The Visa also lists Walus' residence from 1940 through 1947 as Wullenstetten, Germany. In the 1970 application Walus did not list his service in the United States and British armies or the Polish Corps.

Of course we have not had the opportunity to see Walus testify, but we are less inclined than the trial court to discredit the defendant's testimony for what he stated in these applications. We have two reasons for this conclusion: first, the inconsistencies between the documents and the testimony were not significant, and second, the defendant was generally able to explain these differences.

Walus explained that he failed to list his military service in the 1970 application because the question requested him to list "foreign" military service, and he considered the 8th British Corps to be a Polish army and therefore not "foreign." Walus explained that the 1959 application, which called for "places of previous residence," did not give him sufficient space to write every place that he had lived. The application appears to begin its listing in 1937, listing "Swietochow/Polen." Walus explained that in the summer of 1937 he went to Swietochow to tend cattle. His aunt then took him from Swietochow to Warsaw for a short time and then returned to "Gorss Pewel," as stated in the application. Walus explained that "Gorss Pewel" was written on the form by a German clerk. "Gorss Pewel" is the German version of the name

**25.** The Government has not disputed that Walus resided at the scene of his alleged crimes for ten years following the war. Apparently this residence did not result in any prosecution at that time, although Kielce maintains an active war crimes commission. Neither party in this case has confirmed whether any war crimes commission in Poland has even investigated Walus. The Polish War Crimes Commission is the subject of the letters rogatory requested by the defendant in connection with his second Rule 60(b) motion, discussed *infra*.

"Pawel Wilka" where, as he testified, he worked for his uncle until he returned to Fanislawice at the time of the invasion. Walus explained the absence of Kielce and Fanislawice on the 1962 Visa as a mistake. The Visa asked for residences from age 16, and he neglected to list three Polish towns, although he was actually 17 when he left Poland. Finally, Walus explained his listing only Wullenstetten in 1959 and 1962 on the lack of space. Both Wullenstetten and Bubenhausen are located in the County of Neu Ulm. Kleinkotz, in the County of Gunzburg, is very close by.[26]

Walus also presented extensive evidence to corroborate his testimony. Most significant were documents obtained from the German health insurance system, similar to our Social Security Administration, the Allgemeine Ortskrankenkasse (AOK). All farm workers from 1940 to 1945 were insured under this system. The law, in effect since 1914, requires employers to make payments into the system based on employees' earnings. The defendant has submitted an employee card for 1940, his Exhibit 15, showing him to be employed as a laborer on the farm of Karl Ritter in Kleinkotz from March 1940 to June 1940.[27] Furthermore, employer cards, defendant's Exhibits 16 through 23,[28] show this sequence of events: from June 1940 to May 1941, Walus worked in Bubenhausen for August Zeller; from May 1941 to January 1942, he worked in Wullenstetten for Ludwig Stolz, and from January 1942 through June 1945, he worked in Wullenstetten for Fritz Welte.

Margarita Heichlinger testified that she has worked for the AOK since 1941 and that her duty was to post entries on the employer cards. She recognized her handwriting on some of the defendant's Exhibits, but not on others. The spelling of Walus' name varied somewhat on these documents, but his birthdate is consistent.[29] The evidence also showed, however, that Mrs. Heichlinger's father was a Nazi, and that the AOK was under Nazi control at the time of the events in issue. Mr. Wilhelm Rehle, an AOK employee since 1956, testified that old AOK documents are kept in archives with no public access. Rehle had no personal knowledge of privacy practices prior to 1956, however.

In addition to the AOK documents, Walus submitted documents from the International Tracing Service (ITS) of the International Red Cross. The ITS sent forms after World War II to local officials in the war-torn countries seeking information on displaced persons. One ITS document, the defendant's Exhibit 24, dated October 4, 1946 placed Franz Walus, birthdate indecipherable, in Bubenhausen from June 1940 to May 1941. Another ITS document, defendant's Exhibit 25, lists Franz Walus, born July 29, 1922, as having been in Wullenstetten for four years. This document is dated August 10, 1946. The third ITS document, the defendant's Exhibit 26, lists Franz Walus, born July 29, 1922, as appearing on "personnel records" dated June 16, 1940, in Gunzburg. This ITS document is dated February 19, 1949.[30]

26. Even if we were to reject Walus' explanation of these prior statements, the Government's impeachment of the defense evidence would run into logical difficulties. As we discuss *infra*, the Government has had little success in impeaching Walus' documentary evidence, which corroborates his testimony closely. It appears nevertheless that the district court relied on the Government's theory that the defendant somehow single-handedly manufactured the documents to provide an alibi for himself. Even if we set aside our doubts for the moment and assume that this theory has some support in the record, we cannot understand why the defendant would not use this purposely manufactured alibi during the background investigations preliminary to his obtaining United States residence and citizenship.

27. The record search did not locate a corresponding employer card for Exhibit 15.

28. The record search did not locate corresponding employee cards for Exhibits 16 through 23.

29. The district court did not discredit the documents, which were posted by hand, for these variations.

30. The defendant also presented evidence of a search of German military records in the Bundesarchiv, which did not list him as a member of the Gestapo. The Krankenbuchlager, which contains health records of the German military,

Walus also called as witnesses four persons who claimed to have known him in Germany. Viktoria Ritter, the widow of Karl Ritter, on whose farm Walus claimed to have labored between March and June 1940, testified by deposition. Mrs. Ritter testified that she met the defendant in March 1940, when he worked on her husband's farm. Walus left the farm, according to Ritter, because he was too young and weak. On cross-examination Mrs. Ritter admitted that her husband, who was burgermeister of Kleinkotz, and her brother-in-law had been members of the Nazi party, but that both received denazification papers after the war.[31]

Maria Zeller, the widow of August Zeller, testified that the defendant worked on their farm in Bubenhausen from June 1940 to May 1941. According to Mrs. Zeller, Walus left their farm because he was too weak to perform heavy farm work. On cross-examination, Mrs. Zeller admitted that her husband, who was burgermeister of Bubenhausen, was a member of the Nazi party.[32] It was also demonstrated that Mrs. Zeller had previously said that Walus left their employ and moved to Wullenstetten in September 1940, and on another occasion, told a reporter that Walus was there in 1942 or 1943. Mrs. Zeller explained that she did not remember the exact dates of Walus' stay and that she checked the AOK records for exact dates. She also testified that Walus did not try to escape and that Walus was their only farm laborer during his stay there.[33] Finally, it was established that Walus had corresponded with the Zellers over the years, and recently had come to Germany to seek her testimony "because he was being persecuted by the Jews."

Anton Stolz, the son of Ludwig Stolz, testified that Walus began work on his father's farm in Wullenstetten in the Spring of 1941 and left about a year later. Walus was returned to the labor office, once again, because he was too weak. Stolz was born in 1927 and joined the German military in 1943. He was also a member of the "Jung Volk," or Hitler Youth. Stolz also testified that Walus worked on the Welte farm in Wullenstetten after leaving the Stolz farm. Stolz has remained as a friend over the years with Walus. On cross-examination Stolz admitted that as a member of the Hitler Youth he sang songs and recited slogans dealing with principles of Naziism. The Government also showed that one of the AOK documents, the defendant's Exhibit 19, contradicted Stolz' testimony about the dates when a certain Serbian worker was present at the Stolz farm.[34]

Walburga Welte, the wife of Fritz Welte, testified that Walus worked on their farm in Wullenstetten from January or February of 1942 to the end of the war. Since the end of the war, Welte, like the other farmer witnesses, has corresponded with Walus, and Walus traveled to Germany to seek her testimony in this case. On cross-examination the Government established that Mrs. Welte's husband had been a member of the Nazi party.[35] Mrs. Welte denied ever having had Nazi SS officers in her house, contradicting Walus' testimony about their attempts to recruit him near the end of the war. Mrs. Welte also admitted that she had previously told a news reporter that Walus worked for her in 1943 or 1944.

The final witness to testify about Walus' presence in Germany during the war was

also contains no record of Walus. Government evidence, however, showed these records to be incomplete.

**31.** "Denazification" signifies that a former Party member would not be subject to prosecution for war crimes.

**32.** Nazi Party membership was required of all burgermeisters during the Nazi regime.

**33.** The Zeller farm actually had two other workers: a girl who may have worked in the

house, and another laborer, both of whom arrived only a short time before Walus left.

**34.** Apparently recognizing that the documentary evidence submitted by the defendant is compelling, the Government has asked us to use Stolz' testimony for the limited purpose of contradicting the documents, and then to use the information in the documents to discredit Stolz.

**35.** On redirect, Mrs. Welte added that her husband ended his Nazi Party membership before World War II began.

Margarete Goelz. Goelz testified that she met Walus in 1941 when he was working on the neighboring Stolz farm. Goelz testified that Walus visited her home to court her daughter. The Government cites as impeachment Walus' testimony that he knew some forced laborers who were punished for fraternizing with German women. The Government also cites Anton Stolz' deposition statement that Walus came during the summer hay harvest of 1941 as "directly contrary" to Goelz' testimony that he came to the Stolz farm in the fall.[36]

Finally, the defendant's Exhibits 33 through 42 are alleged to be photographs of the defendant [37] between the years 1940 and 1947. Although the defendant's witnesses identified some of the photographs as showing the defendant in Germany in the years in question,[38] the district court rejected Exhibits 33 through 36 because the person depicted "if the defendant, was materially younger than alleged," and because the person depicted is not wearing a "P" on

his clothes.[39] 453 F.Supp. at 707. The trial court did find that Exhibit 38 showed the defendant when he was 24 years old. The district court then compared Exhibit 38 with Exhibits 40 through 42 and determined from this examination that Exhibits 40 through 42, showing a man wearing an Allied forces uniform, did not show the same person.[40]

The district court passed no judgment on Exhibit 39 because it was too small to identify.[41]

To believe the Government's theory of this case, the trial court had to disbelieve not only the testimony of the defendant, but also the testimony of five eyewitnesses, a number of German government documents, and a number of photographs. Although there is no legal rule requiring the Government to do so, we would find the result of this case far less troublesome if the Government had fashioned a coherent theory to sweep this evidence away instead

---

**36.** Walus also submitted the deposition of Father Tomczyk, a Catholic priest in Poland from 1934 through 1945, who testified that he saw Walus in church almost every week in 1939. (Father Tomczyk's parish included the town of Fanislawice.) Father Tomczyk said he last saw Walus, who was then a "very small and tiny" boy, in March 1940. When he next saw Walus, Father Tomczyk was a pastor in Kielce in 1947. According to the Government, this testimony is "in direct variance" with Walus' testimony of his whereabouts in 1939. We think this description exaggerates the discrepancy, if any, in the testimony of the witnesses. As has frequently been true of this case, however, neither the district court nor the Government has explained exactly what the conflict in the testimony is. Walus did testify that between 1939 and 1940 he was in Pawel Wilka or Fanislawice. Fanislawice was in Father Tomczyk's parish, and Pawel Wilka also was not far away. Walus in fact also testified that he attended Father Tomczyk's church.

**37.** This does not include Exhibit 37, which shows the Welte family.

**38.** Viktoria Ritter identified her neighbor's farm buildings in the background of Exhibit 34, Anton Stolz identified himself and the defendant in Exhibit 35. Stolz also identified his parents' farm in the background. Mrs. Welte identified Exhibit 37 as showing her and her family. Exhibit 38 shows Walus with the same children that were identified by Mrs. Welte in Exhibit 37.

**39.** Although Walus testified that the forced laborers wore a "P," he also testified that he took the "P" off on Sundays so he could visit other towns without a permit.

We also note that Exhibits 34 and 36 were stamped "Neu Ulm" on the back. The district court rejected these stamps as not supporting Walus' alibi because they merely showed where the photographs were developed, not where they were taken. 453 F.Supp. at 707–08 n.5.

**40.** In determining that Exhibit 40 did not show the defendant, the district court did not believe the testimony of the Government's witness Michael Alper to the extent that he said Walus told him that Exhibit 40 was made on the advice of a Gestapo superior so that he would have a cover after the war. In any event, the court seems to have made inconsistent findings as to the photographs and this testimony, for it found in another context that

> Walus once showed him [Alper] a photograph of Walus in an American Army uniform and stated that it was taken on the advice of Gestapo associates in case a "cover-up" was ever needed.

453 F.Supp. at 715.

**41.** The defendant offered an enlargement, but the district court would not admit it in evidence.

of merely emphasizing generally inconsequential inconsistencies.

Of course, as the trial court noted, there were inconsistencies between the testimony of the farmer witnesses and Walus. The farmer witnesses did not agree among themselves on the dates for Walus' movements. Walus and the farmers gave different accounts of the discipline used against farmworkers: Walus described the discipline as strict; the farmer witnesses denied this.[42] Furthermore, the testimony of Walus, the testimony of the eyewitnesses, and the documents did not agree as to the precise dates of Walus' movement from one farm to another. It is also true that many of the witnesses changed their minds over the course of these proceedings as to precise dates, possibly casting some doubt on their trustworthiness, but none has ever denied that they knew Walus to be a laborer in the Neu Ulm region of Germany at some time during the war.

Mrs. Welte denied the Nazi recruitment efforts described by Walus, contradicting the defendant's testimony. Mrs. Zeller said Walus did not escape. The AOK documents, which would have been based on the Zellers' knowledge of Walus' activities, similarly did not show this gap in service. Nevertheless, we think that these discrepancies are rather minor. In fact, after thir-

ty-five years, the evidence is remarkably consistent.

█ We also find troublesome the district court's reliance on bias to discredit these witnesses. The trial court in part based its findings on the farmer witnesses' admitted and uncontradicted friendship with the defendant.[43] More troublesome, however, was the trial court's substantial reliance on Nazi ties to discredit not only the farmer witnesses but also the documents.[44] The defendant has argued in his direct appeal that the evidence of connections to the Nazi Party was improperly admitted. We conclude that the admission of this evidence in the absence of a jury was within the district court's discretion and therefore not erroneous. *See United States v. Frankenthal,* 582 F.2d 1102, 1106 (7th Cir. 1978). Although the use of this evidence generally showed only a tenuous relationship to the Nazi Party rather than direct involvement, we do not think that this fact alone compels exclusion of the evidence. *See United States v. Cravero,* 545 F.2d 406, 419 (5th Cir. 1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549; 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377; *United States v. Robinson,* 174 U.S.App.D.C. 224, 530 F.2d 1076 (D.C.Cir. 1976); *United States v. Maynard,* 155 U.S. App.D.C. 223, 476 F.2d 1170 (D.C.Cir.1973). We do emphasize, however, that the sympa-

---

**42.** Walus only described incidents of disciplining other workers, however. Walus testified that he had Sunday off, and Mrs. Welte also testified that the workers had Sunday off, except when it was the season for making hay. Mrs. Ritter testified that Walus often visited her neighbor in the evenings.

**43.** Neither the Government nor the trial court offers an explanation for the origin of these friendships, if they did not arise between the years 1940 and 1945 when Walus claimed to be in Germany. The only hint of such an explanation that we could find in the record was in Michael Alper's testimony that Walus made friends with Gestapo officers in Germany after leaving Poland in 1943. No evidence in the record supports allegations that the farmers, although admittedly Nazis, were in the Gestapo, however.

**44.** Of the AOK documents, the district court said:
There are other factors [in addition to the custodian's lack of personal knowledge of

public accessibility to these documents prior to 1956 or how they were prepared, and in addition to the incompleteness of the records] which impeach these exhibits. First, the AOK was under Nazi control during the war years. . . . Second, the records were prepared exclusively from information supplied by the various farmers; there was no personal contact between AOK personnel and the covered worker. This affects their value as the records contain only information from sources outside AOK control. Furthermore, it has been established that several of Walus' farm employers were Nazi Party members during the relevant periods.
453 F.Supp. at 709.
The district court impugned the farmers' credibility in part because the husbands of Walburga Welte, Viktoria Ritter and Maria Zeller were Nazi Party members and Anton Stolz was himself a member of the Hitler Youth. *Id.* at 706.

thy for Nazi tenets shown by this evidence can only be very slight.[45]

The district court's reasoning that the Nazi connections compromised the documents is the most troublesome use of the evidence of all. The Government has not submitted any evidence that the Nazi regime was likely to keep inaccurate records as a matter of negligence. The Government has instead suggested that the records are a product of a Gestapo effort to cover up its agents' war-time activities. The district court rejected this hypothesis as without support in the evidence. 453 F.Supp. at 716 n.13. If the district court did not suspect a cover-up, we have difficulty understanding its reliance upon Nazi control of the AOK, the "suspicious" absence of corresponding employee and employer cards, and the Nazi connections of Ms. Heichlinger and the farmers who provided the information as impeaching the documents. See note 43 supra.

We similarly do not see evidence of a Nazi cover-up[46] and agree with the district court's rejection of this theory. In the absence of any plausible explanation from the Government or the trial court, based on the evidence, to show why these documents were impeached by the evidence of Nazi connections, we are left only with very minor forms of impeachment for the AOK documents, including Ms. Heichlinger's inability to recognize her handwriting on the records in certain instances, the possibility of public access to the documents before 1956, and the inconsistencies between the documents, Walus' testimony, and the testimony of the farmer witnesses.

Perhaps the only arguably impeaching evidence pertinent to the AOK records are the ITS documents, Exhibits 24, 25, and 26 offered in evidence by the defendant. Exhibit 24, for example, places Walus in Bubenhausen from June 1940 to May 1941. Although these dates corroborate the other evidence, the Government argues that the document actually impeaches the AOK documents, because the ITS document, which is dated in 1946, says that a search of records conducted after the war discloses no documents in Bubenhausen concerning the defendant.[47] The Government also points out that ITS Exhibit 26 refers to documents in possession of the German town of Gunzburg and orders local officials to attach the original or a copy of the documents. No documents are attached. According to the Government, we are to infer, as the trial court apparently did,[48] that the AOK documents did not exist when the ITS documents were made, and the defendant somehow forged or altered these documents after the war and secured the cooperation of other Nazi sympathizers to create an alibi. Although the defendant, if he is guilty of the heinous crimes alleged by the Government, would certainly have had a motive to manufacture an alibi, we find it difficult to believe, without more evidence, that a low-ranking officer would have the wherewithal to accomplish so ambitious a task. When we examine this theory in light of the new-

---

**45.** What we have said about this evidence of bias applies to Anton Stolz as well as the farm wives, although he was himself a member of the Hitler Youth and not merely related to a Nazi Party member. The evidence carries no more weight because Stolz testified merely to activities such as singing Nazi songs and reciting Nazi slogans. These were the activities of a very young man, and they occurred over 35 years ago. They constitute therefore a weak foundation for inferring Nazi sentiments strong enough to inspire the giving of false testimony on behalf of an alleged minor Nazi functionary.

**46.** The Government seems to rely on evidence of motive to support its cover-up theory, but considering the Government's portrayal of Walus as a low-ranking member of the Gestapo, even the motive to create false records seems slight.

**47.** The Government apparently makes a similar argument about ITS Exhibit 25, which pertains to Wullenstetten. The defendant has argued in response, however, that the AOK records would not have been in the possession of local officials in Bubenhausen or Wullenstetten because they were located in the AOK office in Gunzburg.

**48.** The trial court seems to have concluded, although its findings are not clear on this point, that Walus' alibi is the product of his personal efforts, without the assistance of a Gestapo cover-up conspiracy.

ly-discovered evidence, however, the Government's theory becomes impossible to believe.

### The Newly-Discovered Evidence

█ We therefore turn to certain of the newly-discovered evidence supporting the motions to vacate the judgment under Rule 60(b)(2). Because this new evidence destroys the Government's basis for impeaching the defendant's alibi evidence—particularly the AOK documents—we have concluded that the denial of the defendant's motion to vacate the judgment would work an intolerable injustice.

The defendant has offered the testimony of the French citizen and the five witnesses from Poland.[49] The identity and whereabouts of these witnesses were not known to the defendant at the time of the trial as contrasted to the farmers with whom he had a continuing friendly relationship. Thus there is no question of friendship influencing the testimony of the new witnesses. Furthermore, these witnesses, having been forced laborers, are not likely to have Nazi connections or sympathies. Although these new witnesses will testify to the same events as the other witnesses, this new testimony, untainted by any trace of bias, is not merely cumulative. Corroborated by this new testimony, the testimony of the farmers could, in a sense, be more, rather than less credible because of their friendship with Walus; having known Walus over the years, the farmers are unlikely to be mistaken in their identification of the defendant.

The newly-discovered residency documents, which refer to Franz Walus, born July 29, 1922, have a photograph attached, and the young man pictured looks extraordinarily like the young man pictured in the defendant's trial Exhibits 33 through 36, which were discredited by the trial court as showing someone too young to be the defendant in the early 1940's. This document casts severe doubt on the trial court's reasons for rejecting these photographs as evidence of Walus' appearance and whereabouts in the early 1940's.

The new documents give Walus' residence in Germany from March 7, 1940 to June 4, 1940 as the farm of Karl Ritter in Kleinkotz, and from June 4, 1940 to an indefinite date as the farm of August Zeller. These documents thus corroborate almost perfectly the corresponding dates shown on the defendant's AOK Exhibit 15.[50]

The Government points out that these new documents bear the same inconsistencies with the testimony of Walus and the farmers as AOK Exhibit 15. We have already said, however, that the minor discrepancy in dates, a fact belabored by the Government, is hardly compelling evidence of the falsehood of any of the evidence.[51] Nevertheless, the presence of two perfectly corroborative documents is, we think, damaging to the Government's case, which has been built in such great part on the reasoning that two items of evidence that do not say the exact same thing must both be false. *See, e. g.*, note 33 *supra*.

Finally, from the dates and location of the newly-discovered residence documents it is ·clear that they are the documents

---

**49.** As previously noted, the French witness, Andre Bosserdet, was a prisoner of war and claims to have known Walus at Wullenstetten between 1941 and 1945. The five Polish witnesses, named in the defendant's second 60(b) motion, claim also to have known Walus when he was a slave laborer in Germany.

**50.** Exhibit 15 says the defendant began work on March 8, 1940 and the residence permit says March 7, 1940. The date of Walus' move from Kleinkotz to Bubenhausen is listed as June 6, 1940 on Exhibit 15, as opposed to June 4, 1940, given in the new exhibit as the commencement date of his residency with Zeller.

**51.** In filling out this 1940 residency permit the defendant listed Fanislawice as his residence in Poland until March 1940. As it did with the defendant's testimony in court, the Government attempts to discredit this document with the prior statements about the defendant's pre-1940 residence in the 1959 Visa application and the 1962 Visa. We commented on the weakness of these prior statements as impeachment in the context of our discussion of the evidence at trial, *supra*, and do not repeat the reasons here.

referred to in the ITS document which was the defendant's Exhibit 26 at trial. The trial exhibit, ITS Exhibit 26, prepared in 1949, refers to documents prepared by the Office for Foreigners, dated June 16, 1940, from the District Administrative Office in Gunzburg. According to a letter from the Director of the State Archive, the new residency documents, dated June 16, 1940, were found in the Gunzburg Administrative Office and were previously unrecorded. The recent discovery of the very document referred to in at least one of the ITS documents makes it seem more than likely that the absence of the documents referred to in the other ITS Exhibits resulted from the local officials' not having custody of the documents, as urged by the defendant, rather than the defendant's post-war creation or alteration of the documents, as urged by the Government.

We recognize that the trial judge ruled that the new evidence would not produce a different result, and that, having presided at the trial, the trial judge was in a particularly good position to make this determination. *International Nikoh Corp. v. H. K. Porter Co.*, 374 F.2d 82, 84 (7th Cir. 1967). In light of the weakness of the impeachment of the defendant's case at trial, however, we cannot agree with the Government that the defendant should lose his citizenship without a new trial to consider this evidence.

The other prerequisites for granting a Rule 60(b)(2) motion require only a brief discussion. There is little argument that the French witness, the residency documents, and the Polish witnesses were not known to the defendant in time for trial. The French witness presented by the first Rule 60(b) motion, Andre Bosserdet, was unknown to the defendant until the witness came forward following the publicity of the trial. Similarly, the residency documents from the State Archive Neuberg on the Danube, also the subject of the first Rule 60(b) motion, were unfiled and not known to the defendant until after the trial, when they were located through the efforts of the Director of the Archives. Finally, the Government has not disputed that Walus first learned of the five Polish witnesses in October 1978 through the efforts of his father-in-law, who resides near Kielce.

The Government does contend, however, that all of this newly-discovered evidence could have been available for the original trial had the defendant exercised due diligence in searching for it. The evidence offered by the defendant at trial itself shows that the defendant engaged in a costly and extensive search for proof of his innocence, a search that covered two continents and stretched thirty-five years into the past. An affidavit of the defendant's trial attorney accompanying the second Rule 60(b) motion describes in great detail the defendant's efforts to discover evidence, such as the five Polish witnesses at issue here, that might be located behind the iron curtain.[52] The due diligence requirement of

---

**52.** The defendant's attorney wired the Polish War Crimes Commission in Warsaw on August 24, 1977, requesting any information on the defendant in its files or in the files of district commissions in Kielce or Czestochowa. The defendant's attorney also asked the United States Consulate in Warsaw to assist him in his efforts with the War Crimes Commission.

About one week later the United States State Department recommended that he communicate directly with the War Crimes Commission or hire a private attorney in Poland to investigate on his behalf.

Taking this advice, Walus retained a Polish attorney to approach the War Crimes Commission, having already made direct inquiries of the Commission by telegram. A few weeks later, the Polish attorney responded that he could not obtain any information. The War Crimes Commission never responded to the defendant's communications.

Prior to these efforts, Walus' attorney had been on a three-week investigative tour in Europe with the Assistant United States Attorney. The defendant's attorney suggested they visit Poland to take depositions. According to the affidavit of the Assistant United States Attorney, he

told [the defendant's trial attorney] that we did not have visas necessary for entry into Poland and that furthermore, the United States and Poland did not have an international agreement which would allow the United States to apply its perjury sanctions to Polish deponents. Without such an . . . agreement, I believed such depositions would

Rule 60(b)(2) is circumscribed by a rule of reason. *See Giordano v. McCartney*, 385 F.2d 154 (3d Cir. 1967). *See also* 2 C. Wright, Federal Practice & Procedure § 557 at 522 (1969). Perhaps if the defendant's attorney had not been confronted with the extreme difficulty of resurrecting stale evidence from other parts of the world, or if the defendant had been more wealthy, his attorney eventually would have discovered this evidence. Even if this failure could be characterized as neglect, and we in no way imply that it was, we nevertheless cannot hold that the results of this trial are forever insulated from re-examination. In light of the strength of the new evidence, affirmance of the district court's decision "would be to accept an evil far greater than waste of the court's or litigant's time." *Krock v. Electric Motor & Repair Co.*, 339 F.2d 73, 74 (1st Cir. 1964), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298.

■ Finally, in connection with his discovery of the five new witnesses from Poland, the defendant requested the district court to issue letters rogatory to the Polish War Crimes Commission for production of its depositions and investigative file. The defendant has recently been informed by the Commission that the assistance he requested from the Commission could only be given to courts, prosecutors, or national state departments. Secretary of State Vance then sent a communication to the United States embassy in Warsaw asking it to determine whether the Commission ever made an investigation or findings concerning Walus and to urge the Commission to reply to Walus' letters. We do not consider this request a substitute for the information the defendant seeks through letters rogato-

ry. Because we are granting the defendant's motion for relief and ordering a new trial, we see little reason for denying his request that the district court aid him in this matter through the letters rogatory. We realize that the Government has not conceded that the Commission has any information on Walus and that this is the defendant's first attempt to obtain the letters. We do not agree that this fact shows any lack of due diligence by the defendant, however. As we set forth in note 51 *supra*, the defendant did follow the instructions of the United States State Department in approaching the War Crimes Commission and was unaware of the restrictive communication policy of that body until after completion of the trial. Furthermore, the United States Attorney had similarly failed to obtain any information from the Commission.

■ Inasmuch as we have concluded that the defendant's Rule 60(b) motions should have been granted, we reverse the judgment of the district court and remand the cause for a new trial before a different judge [53] pursuant to our Circuit Rule 18. Costs for these appeals will be awarded to the defendant.

■

be useless under the Federal Rules of Civil Procedure.

The defense attorney's affidavit further asserts that Walus, who was unemployed, spent over $6,000 on his attorney's out-of-pocket costs in investigating the case.

Finally, according to the defense attorney's affidavit, the United States Attorney also approached the Polish War Crimes Commission and received no response.

**53.** We have considered the defendant's arguments to the contrary, but we have concluded that we are bound by the Supreme Court's ruling that there is no right to a jury trial in civil denaturalization proceedings, *Luria v. United States*, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101 (1913), and that the Supreme Court's more recent decisions in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), do not undercut the authority of that case.