Maria MEJIA, et al.,
Plaintiffs-Appellants,

v.

The UNITED STATES DEPARTMENT
OF HOUSING AND URBAN DEVEL-
OPMENT, et al., Defendants-Appellees,
and

City of Chicago, et al.,
Defendants-Appellees.

Nos. 81–2897, 81–2944.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1982.

Decided Sept. 15, 1982.

As Amended Sept. 30, 1982.

Rehearing Denied Oct. 27, 1982.

Howard A. Learner, Business & Professional People for the Public Interest, Chicago, Ill., for plaintiffs-appellants.

Jerome A. Siegan, Corp. Counsel, Chicago, Ill., Richard C. Stearns, Gen. Counsel, HUD, Washington, D. C., for defendants-appellees.

Before BAUER, Circuit Judge, GIBSON, Senior Circuit Judge,* and POSNER, Circuit Judge.

* The Honorable Floyd R. Gibson, Senior Judge of the United States Court of Appeals for the

BAUER, Circuit Judge.

The issue in this appeal is whether federal community development block grant (CDBG) funds may be used to finance the City of Chicago's commercial redevelopment project known as the Milwaukee/Ashland Project. The district court held that they may. We affirm.

Plaintiffs, homeowners and tenants involuntarily displaced by the Project, initiated this action against the City of Chicago and the United States Department of Housing and Urban Development (HUD) by filing a motion for a preliminary injunction. They sought to enjoin HUD from releasing, and the City from spending, CDBG funds until the City cured the alleged defects in its application for these funds. That motion was denied and the funds were released.

Plaintiffs proceeded with the litigation, attempting to prevent the City from spending the released funds and seeking a declaratory judgment that HUD illegally approved the City's application, thereby triggering the funds' release, despite the fact that the application did not comply with the requirements of the Housing and Community Development Act of 1974 (HCDA), 42 U.S.C. § 5301 et seq., the Uniform Relocation and Real Property Acquisition Act of 1970 (URA), 42 U.S.C. § 4601 et seq. or the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. Plaintiffs alleged that HUD violated the Administrative Procedures Act, 5 U.S.C. § 701 et seq., by approving the City's application and that the City violated the Civil Rights Act, 42 U.S.C. § 1983, by improperly applying for, receiving and spending the funds. After discovery was completed and the administrative record was compiled, the parties filed cross motions for summary judgment. The district court granted defendants' motions and denied plaintiffs' motion, holding that the City's application complied with all mandatory requirements and that HUD's approval was proper. Plaintiffs filed a mo-

Eighth Circuit, is sitting by designation.

tion for reconsideration which was also denied.[1]

The HCDA requires all applicants for CDBG funds to submit an application to HUD which satisfies not only the HCDA requirements but also the URA and the NEPA requirements. The application must include: (1) a Housing Assistance Plan (HAP) which provides a "reasonable opportunity" to relocate in the immediate area, required by the HCDA; (2) "satisfactory assurances" that displaced residents will be provided with "comparable replacement dwellings," required by the URA; and (3) an environmental review and certification that the City will comply with all statutory environmental review responsibilities, required by the NEPA. Plaintiffs maintain that the district court erroneously concluded that the City's application satisfied the requirements of all three statutes.

Since plaintiffs allege separate causes of action against the federal and city defendants, we apply different standards of review in evaluating the claims against them. In reviewing the claims against the City, we must determine whether the district court was correct in concluding, as a matter of law, that the City's application met the requirements of the relevant statutes. *See Scherer v. Cosgrove*, 511 F.2d 707 (4th Cir. 1975). In reviewing the claims against HUD, we must determine whether the agency action approving the application was arbitrary, capricious, or an abuse of administrative discretion, or otherwise not in accordance with law. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Section 5304(c)(1)(C)(i) of the HCDA [2] entitles tenants displaced as a result of redevelopment projects to a "reasonable opportunity" to relocate in their immediate neighborhood. In this case, however, all parties agree that no relocation housing in the immediate neighborhood exists. For this reason, the district court construed § 5304(c)(1)(C)(i) to mean that displaced residents were entitled to a "reasonable opportunity" to relocate in their immediate neighborhood only when such housing was, in fact, available. It concluded that unless an implied exception were read into the statute to cover situations in which there were no opportunities to relocate in the immediate neighborhoods, many urgently needed redevelopment projects would be blocked.

Plaintiffs concede that the "reasonable opportunity" provision is not a guarantee. However, they assert that this provision is a statutory mandate which cannot be ignored and maintain that where no opportunity exists, the City must either create that opportunity or, at the very least, demonstrate why it cannot do so. Challenging the district court's conclusion that a redevelopment project must die whenever no relocation housing exists, they claim that the City has the power either to aid private developers in providing replacement housing or to use its "houser of last resort" power, authorized by the URA, to provide the opportunity itself. They contend that "reasonable opportunity" cannot mean "no opportunity" and believe that § 5304(c)(1)(C)(i) should be interpreted to preclude displacement causing projects funded under the HCDA whenever no opportunity to relocate in the immediate neighborhood can be provided. Appellants' br. at 20.

### I

Our initial consideration is whether "reasonable opportunity" is an absolute requirement. Plaintiffs base their contention that the "reasonable opportunity" requirement

---

**1.** This case was originally before Judge Crowley, who ruled on the motion for preliminary injunction and the cross motions for summary judgment. *Mejia v. HUD*, 518 F.Supp. 935 (N.D.Ill.1981). Following Judge Crowley's retirement, the case was assigned to Judge Flaum, who ruled on the motion for reconsideration. *Mejia v. HUD*, No. 81 C 961 (N.D.Ill. Oct. 30, 1981). Thereafter plaintiffs filed their appeal. HUD responded with a cross-appeal,

No. 81–2944, which was dismissed pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure on February 26, 1982. Thus, this opinion is dispositive only of appeal No. 81–2897.

**2.** This provision was previously numbered § 5304(a)(4)(C)(i). The provision was renumbered after the district court opinions were issued.

cannot be waived on two arguments. First, they assert that if Congress had intended this requirement to apply only when relocation housing in the immediate neighborhood were available, it would have so stated. In support of this assertion, they maintain that when Congress intends to create exceptions to statutory provisions, it expressly includes the exceptions in the statutes. To illustrate their point, plaintiffs compare the HCDA's "reasonable opportunity" provision to a provision in the Hill-Burton Act which requires, as a precondition to receiving federal funds, that hospitals give assurances that they will provide a "reasonable volume of services to persons unable to pay." 42 U.S.C. § 291c(e)(2). Plaintiffs note that the Hill-Burton Act specifically states that "an exception shall be made if such a requirement is not feasible from a financial viewpoint." *Id.* They emphasize that, in contrast, neither the HCDA nor its regulations contain a similar exception. Thus, they maintain that Congress did not intend to provide an exception to the "reasonable opportunity" provision. Plaintiffs next assert that recent federal housing legislation indicates Congress never intended urban redevelopment to lead to the wholesale displacement of neighborhoods. Plaintiffs maintain that the HCDA must be construed according to its plain meaning and argue that, so construed, there can be no exception to the "reasonable opportunity" provision.

■ In construing the language of § 5304(c)(1)(C)(i), we are mindful that canons of statutory construction are merely aids to ascertaining congressional intent. *Patagonia Corp. v. Board of Governors of Federal Reserve System,* 517 F.2d 803 (9th Cir. 1975). Thus, in determining whether there is an implied exception to the "reasonable opportunity" provision, we consider the literal terms of the statute in conjunc-

tion with Congress' intent to promote the revitalization of urban areas. *See Tremps v. Ascot Oils, Inc.,* 561 F.2d 41 (7th Cir. 1977). We conclude that interpreting the "reasonable opportunity" requirement as absolute would frustrate the very kind of redevelopment the HCDA was designed to promote. We cannot believe that Congress intended to preclude cities from receiving CDBG funds for desperately needed redevelopment projects whenever relocation housing in the immediate neighborhood does not exist, particularly since cities cannot control the availability of relocation alternatives. Indeed, it is probable that many blighted areas in need of redevelopment have deteriorated to the point where there is no relocation housing in the immediate area. Under plaintiffs' interpretation redevelopment would be precluded in those areas which would most benefit from such redevelopment. Moreover, our interpretation is in no way inconsistent with the general policy discouraging wholesale displacement of neighborhoods, for there must be an exception to the general policy when it is impossible to effect that policy. We conclude that the district court was correct in holding that "the reasonable opportunity to relocate in the immediate neighborhood must be read to require assisting such relocation if housing is available." [3] *Mejia v. HUD,* 518 F.Supp. 935, 938 (N.D.Ill.1981).

## II

Plaintiffs next contend that even if the HCDA contains an implied exception to the "reasonable opportunity" provision when no relocation housing exists in the immediate area, that exception does not come into play until after the City has attempted to create a "reasonable opportunity." They state that the City has numerous powers under the HCDA regulations to aid housing devel-

---

**3.** The federal defendants concurred with the district court's final decision, but maintain that the "reasonable opportunity" provision is an objective rather than a requirement. The district court considered this argument but concluded that "[a]lthough more careful drafting may have clearly identified the exact reference and meaning of the 'reasonable opportunity' clause, the clause should not be considered merely an objective, but rather 'some sort of requirement.'" *Mejia v. HUD,* 518 F.Supp. 935, 938 (N.D.Ill.1981). We find that analysis compelling and adopt it here.

opers to provide housing[4] as well as "houser of last resort" power under the URA to create the opportunity itself.

Plaintiffs concede that under the URA the "houser of last resort" power is triggered only if comparable replacement housing is unavailable and that comparable replacement housing need not be in the immediate neighborhood. However, they argue that "[a]lthough in the URA context, the 'trigger' for use of [houser of last resort authority] is 'comparable replacement housing' which is not limited geographically to the immediate neighborhood, this does not justify the conclusion that *in the HCDA context* the power is not to be used to achieve the HCDA's purposes." Appellants' br. at 24 (emphasis in original).

We cannot agree. While the HCDA regulations provide the City with numerous powers to encourage private developers to build subsidized housing, the regulations do not require that the City utilize these powers. Similarly, nothing in the language of the HCDA or its regulations suggests that the URA's "houser of last resort" power is automatically triggered whenever replacement housing in the immediate neighborhood is lacking. Adopting plaintiffs' interpretation that the City must exercise its powers to encourage or develop relocation housing in the immediate neighborhood when none exists would lead to the ridiculous result of preventing redevelopment projects in blighted areas even though comparable replacement housing is available. Therefore, we also agree with the district court that the City need not use its powers to create a "reasonable opportunity" to relocate in the immediate neighborhood when comparable replacement dwellings exist elsewhere. *Mejia v. HUD,* No. 81 C 961, slip op. at 2 (N.D.Ill. Oct. 30, 1981).[5]

## III

The NEPA regulations required the City to prepare an environmental review to determine whether the proposed project would significantly affect the quality of the human environment. 24 C.F.R. § 58.15. Plaintiffs allege that the City's environmental review failed to comply with the NEPA's procedural requirements or to examine, in a meaningful way, whether the Project would have any adverse environmental impacts. These arguments were previously raised in the district court on several occasions. *Mejia v. HUD,* No. 81 C 961, slip op. (N.D.Ill. Oct. 30, 1981); *Mejia v. HUD,* 518 F.Supp. 935 (N.D.Ill.1981); *Mejia v. HUD,* No. 81 C 961, slip op. (N.D. Ill. Apr. 3, 1981). Because we find that the district court, after carefully analyzing these arguments, correctly rejected them, we need not repeat these analyses here. Accordingly, we address the plaintiffs' contentions only briefly below.

4. Appellants state that under the HCDA and its regulations, the City has the power to:

—acquire sites and provide site improvements for the development of assisted housing. 24 C.F.R. § 570.306(b)(3)(iii)(A).

—otherwise promote and assist development of assisted housing in the immediate neighborhood. 24 C.F.R. § 570.306(b)(3)(iii)(F).

—encourage developers to allocate a portion of their planned unsubsidized developments for assisted housing. 24 C.F.R. § 570.-306(b)(3)(iii)(F).

—encourage owners of rental property to make units available for holders of rent subsidy certificates under the Section 8 program. 24 C.F.R. § 570.306(b)(3)(iii)(F).

—subsidize the rehabilitation of housing to increase the supply of vacant habitable units. 24 C.F.R. § 570.202(a), (c).

—subsidize new housing construction by neighborhood-based nonprofit organizations, local development corporations and small business investment corporations. 24 C.F.R. § 570.207(f), 24 C.F.R. § 570.204(c)(4).

—hold temporarily vacant rental units available for displaced persons by paying housing owners for losses of rental income incurred in the interim. 24 C.F.R. § 570.201(j).

—provide additional relocation payments and assistance to make more costly rental units "affordable" to the lower-income displacees. 42 U.S.C. § 5305(a)(11).

Appellants' br. at 21.

5. Plaintiffs also contend that, apart from the duty to provide a "reasonable opportunity to relocate in the immediate neighborhood," the HCDA and its regulations require that displacement be minimized. They assert that the City has failed to take appropriate steps to minimize displacement. This argument fails for the same reason plaintiffs' "reasonable opportunity" argument fails.

Plaintiffs contend that the NEPA was not satisfied because the City's environmental review: (1) did not establish an accurate data base from which to evaluate the Project's impact; (2) was not prepared in the early stages of the planning when it would have been feasible to modify the Project to reduce any adverse effects revealed by the review; and (3) failed to assess the cumulative impact of all CDBG activities in the Near Northwest Neighborhood Strategy Area. Each of these arguments fails.

■ With respect to the first argument, we note that the district court carefully reviewed the City's extensive environmental review and found that the forty-four page review satisfied regulatory standards because it considered: (1) short and long term goals relating to housing community improvements and public facilities, economic development, and public services; (2) site location and accessibility; (3) neighborhood trends; (4) local population characteristics; (5) local employment trends; and (6) community assets and problems. *Mejia v. HUD*, No. 81 C 961, slip op. at 11–12 (N.D. Ill. Apr. 3, 1981). Yet, plaintiffs contend that the review underestimated the number of residents who would be displaced and failed to describe the supply of housing resources available for these displaced persons. Citing no authority in support, plaintiffs conclude that the City's review "could hardly examine the nature, magnitude and extent of displacement . . . or the modifications or alternatives that would eliminate or minimize any adverse environmental impacts," as required by 24 C.F.R. § 58.15. Appellants' br. at 34.

We do not believe that the record establishes that plaintiffs' statistics are more accurate than the City's statistics. Moreover, assuming *arguendo* that plaintiffs are correct that the number of displaced residents is greater than anticipated, nothing in the NEPA or its regulations suggests that a mathematical error automatically renders the City's review defective. *See Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292 (8th Cir. 1976), *cert. denied*, 430

U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977).

Plaintiffs also argue that the City's review was a "post hoc rationalization" because by the time it submitted its review to HUD, plans for the Project were well underway, requests for CDBG funds had already been approved and construction had begun. However, NEPA regulations merely require that the review process begin as early in the development stages as possible and be completed while any necessary Project modifications can still reasonably be considered. 24 C.F.R. § 58.15. Thus, even if all plaintiffs' allegations are true, their argument is without merit, for they have failed to show that the proposed Project had progressed to the stage where an irretrievable commitment of resources foreclosed any necessary modifications or alternatives. *See Jones v. D.C. Redevelopment Land Agency*, 499 F.2d 502 (D.C.Cir.1974).

Similarly, plaintiffs' argument that the City's review failed to satisfy 24 C.F.R. § 58.5(d)(3) because it did not assess the cumulative impact of all the CDBG activities in the Neighborhood Strategy Area, which includes the Milwaukee/Ashland Project, is not compelling. Plaintiffs believe a review which aggregates all projects in the Near Northwest Neighborhood Strategy Area would be more helpful than the City's review. While plaintiffs may be correct, they are asking this court to substitute its judgment for that of the City. This we decline to do.

We conclude that the City's application was legally sufficient under the HCDA, the URA and the NEPA and affirm the district court's order of summary judgment in favor of the City.

## IV

The last consideration is whether HUD's approval of the application was arbitrary and capricious, or an abuse of administrative discretion or otherwise not in accordance with law. 5 U.S.C. § 706. Plaintiffs claim that HUD automatically approved the City's application without following its own procedural regulations in evaluating the review.

Under 42 U.S.C. § 5304,[6] the section in effect at the time the City submitted its application to HUD, HUD had limited review powers. Section 5304(e) required the Secretary to approve an application for CDBG funds if it satisfied the requirements of § 5304(a) unless: (1) the application did not reflect the community's needs; (2) the application proposed activities which were "plainly inappropriate" to meeting the community needs and objectives; or (3) the application did not comply with the requirements of the HCDA or other applicable law or proposed activities which were not eligible for CDBG funding.

Certainly the clearance of slums is not "plainly inappropriate" to meeting community needs and objectives and we have already concluded that the City's application was valid under the HCDA, URA and NEPA. Thus, HUD's approval cannot be improper unless the application did not reflect community needs.

The only argument plaintiffs raise in support of their theory that HUD failed to sufficiently evaluate whether the application reflected community needs is that HUD did not require the City to assess the cumulative impact of all CDBG funded displacements in the entire Near Northwest Strategy Area. This argument is not persuasive, however, for HUD has the discretion to determine whether an aggregate review of several projects is required. *Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225 (7th Cir. 1975), *cert. denied sub nom. Nucleus of Chicago Homeowners Ass'n v. Hills*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). The mere fact that HUD determined that the City's review, limited to the Milwaukee/Ashland Area, was adequate is not an abuse of HUD's discretion. HUD's action was wholly in compliance with its own regulations.

Accordingly, the decision of the district court granting summary judgment in favor of the City and HUD is

AFFIRMED.

6. 42 U.S.C. § 5304 has since been revised and 42 U.S.C. § 5318, which also deals with HUD's

responsibilities, has been added.