867 F.2d 395
 12 Fed.R.Serv.3d 1290
 Jose GOMEZ, Rafaela Chavez, Norma Rodriguez, Hector Zurita,
Rosendo Reyes, Arturo Montalio, Navin Patel,
Ramirez Rosario Flores, Delia Sanchez,
and HOPE, Inc., Plaintiffs-Appellants,
v.
Lance M. CHODY, Lance M. Chody, Ltd., CDA
Designers/Builders/Developers, Inc., Management Associates,
City of Wood Dale, County of DuPage, and United States
Department of Housing and Urban Development, Defendants-Appellees.
 Nos. 87-1935, 87-3131.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 23, 1988.
Decided Jan. 31, 1989.
Rehearing and Rehearing En Banc in No. 87-3131 Denied Feb. 27, 1989.
 
 Kathryn E. Korn, Sidley & Austin, Chicago, Ill., for plaintiffs-appellants.
 Robert J. Zaideman, Epstein, Zaideman & Esrig, P.C., Chicago, Ill., J. Patrick Jaeger, DuPage County State's Atty. Office, Nancy K. Needles, Chief, Civil Div., U.S. Atty. Office, Chicago, Ill., for defendants-appellees.
 Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 This housing discrimination case is a consolidation of two appeals based on the same underlying facts. In the first appeal (87-1935), we must determine whether the district court erred in granting summary judgment to the defendants on all issues. In the second appeal (87-3131), we must determine whether the district court erred in denying the plaintiffs' motion for relief under Federal Rule of Civil Procedure 60(b). Because we find no merit to the contentions raised by the plaintiffs, we affirm the judgments of the district court.I
 
 Background
 A. Procedural Posture
 
 2
 The plaintiffs-appellants (plaintiffs) are persons of Hispanic descent. They filed a complaint in the district court on September 9, 1986 in which they alleged that the defendants-appellees (defendants) violated various federal and state housing laws with respect to the renovation of the Grove Street Apartments in Wood Dale, DuPage County, Illinois. Count I stated a violation of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (URA), 42 U.S.C. Sec. 4601 et seq.: that the plaintiffs did not receive the relocation compensation and assistance required by the URA. Count II alleged a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d et seq.: that the defendants discriminated against the plaintiffs based on their national origin. Count III alleged a violation of the Fair Housing Act of 1974 (FHA), 42 U.S.C. Sec. 3601 et seq.: for the same reason set forth in count II--discrimination based on national origin. Count IV alleged violations of the Housing and Community Development Act (HCDA), 42 U.S.C. Sec. 5301 et seq.: that the defendants denied the plaintiffs a reasonable opportunity to relocate in the immediate neighborhood. Count V alleged that the plaintiffs were direct and express third-party beneficiaries of contracts between Mr. Chody, Wood Dale, DuPage County, and the United States Department of Housing and Urban Development (HUD), and therefore were entitled to certain contractual benefits and protections. Count VI alleged various violations of state law for constructive eviction.
 
 
 3
 The plaintiffs also requested a temporary restraining order to prevent the defendants from: (1) continuing with rehabilitation of the apartments; and (2) further releasing or spending any public monies until the plaintiffs received all of the benefits and protections required by law. In addition, the plaintiffs sought to compel the defendants to restore their utilities, facilities, and services under the terms of their leases. The district court denied relief on the ground that the plaintiffs failed to demonstrate a sufficient likelihood of success on the merits.
 
 
 4
 Thereafter, the defendants collectively filed motions to dismiss and/or motions for summary judgment. Because various documents were filed with the motions to dismiss, the district court treated all the motions as motions for summary judgment. In a memorandum opinion and order dated April 14, 1987, the district court granted the defendants' motions for summary judgment with respect to all counts. The plaintiffs filed a timely notice of appeal on June 10, 1987.
 
 B. Facts
 
 5
 At the time this action arose, the plaintiffs were all former or current residents of the Grove Street Apartments (the apartments) in Wood Dale. The apartments consisted of five three-story buildings containing seventy-three separate dwelling units. Prior to this action, ninety-five percent of the apartments' residents were Hispanic and this number accounted for more than sixty percent of the Hispanic population in Wood Dale.
 
 
 6
 In 1982, Wood Dale had applied to the County, through the Community Development Commission, for Community Development Block Grant (CDBG) funds in order to acquire and renovate the apartments. The following year, Wood Dale revised its application to seek CDBG funds only for rehabilitation of the apartments; the acquisition was to be made with private funds. Eventually, HUD approved a $1,084,472 grant of CDBG funds for the rehabilitation of the apartments. However, these funds were not utilized while Wood Dale searched without success for additional funds.
 
 
 7
 The apartments were in an advanced state of dangerous disrepair, unsanitary, and infested with insects and rodents. They violated Wood Dale's building code and were declared a public nuisance in September 1984. In February 1985, Wood Dale sought an injunction in state court ordering the apartments' owners to make necessary repairs or to demolish the apartments. On August 15, 1985, Wood Dale and the County entered into an Intergovernmental Agreement setting forth the rehabilitation obligations of each municipality with respect to the apartments.
 
 
 8
 In July 1986, the apartments were acquired by a private contractor, defendant Lance M. Chody. Mr. Chody purchased the apartments for $1,093,500--using private funds--under the condition that the CDBG funds would be available for the rehabilitation project. In connection with the purchase, Mr. Chody intervened as a defendant in Wood Dale's state court action and, on June 17, 1986, entered into a consent decree with all parties. As part of the decree, Mr. Chody agreed to comply with the requirements of the Intergovernmental Agreement which included, inter alia, that at least fifty-one percent of the renovated apartments would be occupied by low and moderate income persons at affordable rates.
 
 
 9
 The rehabilitation of the apartments involved gutting and renovation. To proceed with the project, all of the former residents of the apartments had to be displaced. On February 28, 1986, the HUD relocation specialist informed the County that "as long as ... no public funds [were] used to acquire the property the Uniform Act for Acquisition and Relocation [would] not apply. But, because of the extensive rehab[ilitation] ... and the fact that CDBG funds [would] be used ... some sort of relocation assistance [had to] be provided." Appellants' Ex. 7, DuPage County's Br. at 9. Therefore, pursuant to its own relocation policy,[1] the County adopted a plan to provide relocation assistance to those displaced by the rehabilitation of the apartments.
 
 
 10
 After the purchase of the apartments, Mr. Chody began demolishing portions of the structures. In addition, he turned off utilities to several apartments where tenants still resided. Approximately two weeks after the commencement of the construction work, Mr. Chody sent notices--drafted by the County--to inform tenants that they were being displaced. However, the County received several complaints because the notices were in English and the overwhelming majority of tenants were Spanish-speaking. Accordingly, Mr. Chody reissued the notices in Spanish and the County advised the remaining tenants of their relocation rights.
 
 II
 87-1935
 
 11
 In this appeal, the plaintiffs challenge several aspects of the district court's grant of summary judgment. They raise issues under: 1) the Uniform Relocation Assistance Act (URA); 2) the Fair Housing Act (FHA); and 3) the Housing and Community Development Act (HCDA). We shall address each of these matters in the following subsections. However, at the outset, it would be useful to reiterate--indeed to emphasize--the standards that govern the district court's consideration of a motion for summary judgment. In Beard v. Whitley County REMC, 840 F.2d 405 (7th Cir.1988), we noted:
 
 
 12
 A motion for summary judgment should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); Illinois v. Bowen, 808 F.2d 571, 574 (7th Cir.1986). However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party must do more than simply "show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " Id. at 587, 106 S.Ct. at 1356 (quoting, First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). "The court should neither 'look the other way' to ignore genuine issues of material fact, nor 'strain to find' material fact issues where there are none...." Secretary of Labor v. Lauritzen, 835 F.2d 1529, 1534 (7th Cir.1987) (quoting Mintz v. Mathers Fund, Inc., 463 F.2d 495, 498 (7th Cir.1972)).
 
 
 13
 When the issue is one of intent, we approach the application of these principles with special caution. See Powers v. Dole, 782 F.2d 689, 694 (7th Cir.1986). However, the basic allocation of responsibility among the parties remains the same and "even when such issues of motive or intent are at stake, summary judgment is proper 'where the plaintiff presents no indication of motive or intent supportive of his position.' " Id. (quoting Munson v. Friske, 754 F.2d 683, 690 (7th Cir.1985)).
 
 
 14
 Id. at 409-10 (emphasis in original).
 
 A. Uniform Relocation Assistance Act
 1. Submissions of the Parties
 
 15
 The URA requires the provision of various benefits to persons who come within the definition of "displaced person" under the Act. A "displaced person" protected by the URA means:
 
 
 16
 any person who ... moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance....
 
 
 17
 42 U.S.C. Sec. 4601(6).
 
 
 18
 The plaintiffs contend that Mr. Chody was an "instrumentality" of a "state agency"[2] under the URA and that the Act therefore applies to the acquisition of the apartments. As a result, they submit that they were entitled, as "displaced persons" under the Act; to receive relocation payments and assistance in accordance with federal law. The appellees collectively contend that Mr. Chody was not an instrumentality of a state agency and, consequently, the federal assistance requirements of the URA were not triggered.
 
 2. Resolution by the District Court
 
 19
 Relying on this court's opinion in Conway v. Harris, 586 F.2d 1137 (7th Cir.1978), the district court noted that Mr. Chody, as a private individual, acquired the apartments and sent eviction notices to the tenants himself. Accordingly, there was no governmental or state action as defined by the URA and there can be no federal claim arising under the statute.
 
 3. Analysis
 
 20
 We agree with the district court that this issue is controlled by our holding in Conway. Although Mr. Chody was slated to receive public funds for the rehabilitation of the apartments, there is nothing in the record to contradict Mr. Chody's affidavit that the private acquisition of the apartments was made with private funds. Several courts of appeals that have addressed this issue, including our own, have concluded that "[c]learly, no section [of the URA] provides that benefits should be extended to a person such as the plaintiff who was displaced by the acquisition of real property by a private party who would receive federal assistance in the future." Conway, 586 F.2d at 1140 (emphasis supplied); see, e.g., Isham v. Pierce, 694 F.2d 1196 (9th Cir.1982); Young v. Harris, 599 F.2d 870 (8th Cir.), cert. denied, 444 U.S. 993, 100 S.Ct. 526, 62 L.Ed.2d 423 (1979); Moorer v. HUD, 561 F.2d 175 (8th Cir.1977), cert. denied, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978); Parlane Sportswear Co. v. Weinberger, 381 F.Supp. 410 (D.Mass.1974), aff'd, 513 F.2d 835 (1st Cir.), cert. denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975).
 
 
 21
 Nor do we believe that, with respect to the acquisition of the apartments, Mr. Chody can be considered an "instrumentality" of the state or its agencies. Some courts have suggested that this term could bring within the ambit of the statute private contractors whose actions are "sufficiently intertwined" with the state. See Isham, 694 F.2d at 1205; Young, 599 F.2d at 877. However, the situation here certainly is not subject to such a characterization. The record unequivocably establishes that Mr. Chody purchased the project with private funds and undertook the project as a private business venture. His reliance on state funds for future renovation does not change, for purposes of this statute, the private nature of his undertaking.
 
 B. The Fair Housing Act
 1. Submissions of the Parties
 
 22
 The relevant part of the FHA reads as follows:
 
 
 23
 [I]t shall be unlawful--
 
 
 24
 (a) To ... make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.
 
 
 25
 (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.
 
 
 26
 42 U.S.C. Sec. 3604(a)-(b).
 
 
 27
 The plaintiffs allege a case of disparate impact discrimination, which, they assert, violated the FHA's proscription against discrimination in the rental of a dwelling or the provision of services. See 42 U.S.C. Sec. 3604. Specifically, they contend that the manner of their displacement was unnecessarily disruptive and effectively precluded them from obtaining other housing in the Wood Dale area. They rely on the four factors set forth by this court in Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir.1977), cert. denied, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978):
 
 
 28
 (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of Washington v. Davis [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.
 
 
 29
 See also Phillips v. Hunter Trails Community Ass'n, 685 F.2d 184, 189-90 (7th Cir.1982).
 
 
 30
 With respect to the first factor, the plaintiffs submit that the record establishes that all residents of the complex were displaced; ninety-five percent were Hispanic. These persons represented sixty percent of the City's Hispanic population. With respect to the second factor, they argue that the record establishes that the defendants "made no timely or serious attempt to furnish alternative housing within the City for the displaced Hispanic tenants." Appellants' Br. at 26. They commenced construction before the date set for the tenants' vacating the premises thus requiring many tenants to leave before they were approached with relocation assistance. Finally, they note that the initial notice prepared and distributed by Mr. Chody was in English and listed a nonworking telephone number. With respect to the third factor, the plaintiffs concede that the defendants had an interest in repairing the complex but argue that "there is no support in the record for a conclusion that the sudden and disruptive manner in which the rehabilitation commenced was necessary." Id. at 27. With respect to the fourth factor of the Arlington Heights analysis, the plaintiffs point out that they seek no affirmative relief because they seek no special provision for their housing. Rather, "they seek only the relocation assistance and the equal treatment to which they are entitled under law." Id. The plaintiffs contend that the defendants, by their actions, "virtually guaranteed that a large segment of the City's minority population would be dispersed." Id. at 29.
 
 
 31
 In reply, Mr. Chody stresses that all tenants were displaced. Moreover, that displacement would have been necessary even if he had not undertaken the project's redevelopment because the condition of the structure would have required its closing. Mr. Chody also notes that he was contractually obligated to make at least fifty-one percent of the units in the apartments available to low and moderate income persons. He also notes that, before the district court, the plaintiffs acknowledged the absence of discriminatory intent. With respect to the third Arlington Heights factor, Mr. Chody argues that his motivation is obviously a permissible economic one and that the government defendants are interested in urban renewal, not discrimination. Finally, he suggests that the broad equitable relief requested by the plaintiffs in the complaint supports, under the fourth Arlington Heights factor, summary judgment for the defendants. In its brief, DuPage County also notes that the dislocation was inevitable and was not based on national origin but on the physical condition of the apartments. The County further stresses that its payment of the relocation allowances was accomplished during the time-frame permitted by federal regulations. It also submits that the record establishes that Spanish language translators were made available throughout the relocation process.
 
 2. Resolution by the District Court
 
 32
 Noting that the FHA count was alleged in conclusory fashion, the court determined that it "cannot logically conclude that Defendants' actions have denied Plaintiffs[ ] housing or 'services' because of their national origin." Gomez v. Chody, No. 86 C 6776, memorandum opinion and order at 15, (N.D. Ill. Apr. 14, 1987) [hereinafter Mem. op.] R.80 at 15. The court acknowledged that Congress' stated policy to provide fair housing nationally requires a broad reading of the FHA. However, the court noted that, assuming the defendants were required to make relocation payments to the plaintiffs, their purported refusal to do so was too attenuated from the alleged harm to be cognizable under the FHA. Mem op. at 14. The court noted that the defendants had not denied housing only to Hispanics but that the apartments were to have been demolished and that everyone living in them would have been displaced regardless of their national origin. The buildings had been declared a public nuisance. The court noted that, as an alternative to the demolition of the building, the acquisition and rehabilitation of the apartments by Mr. Chody, together with his contractual obligation to have at least fifty-one percent of the apartments occupied by low or moderate income persons, would provide the opportunity for the plaintiffs to return to the apartments after the rehabilitation.
 
 3. Analysis
 
 33
 As this court has recently reemphasized, the FHA, enacted as Title VIII of the Civil Rights Act of 1968, prohibits discrimination by the denial of housing or services to individuals based on race, color, religion, sex, or national origin. Burrell v. City of Kankakee, 815 F.2d 1127, 1130 (7th Cir.1987); Southend Neighborhood Improvement Ass'n v. County of St. Clair, 743 F.2d 1207, 1209 (7th Cir.1984). "Congress's purpose in enacting the Act was 'to provide, within constitutional limitations, for fair housing throughout the United States.' 42 U.S.C. Sec. 3601 (1968). Courts have thus applied the Act broadly within its terms." Southend, 743 F.2d at 1209; see Arlington Heights, 558 F.2d at 1289 (collecting cases). Under this statutory scheme, a discriminatory effect, without any discriminatory intent, may constitute a violation of the FHA. However, we explicitly have refrained from holding that a discriminatory impact alone always violates the Act. See Burrell, 815 F.2d at 1131.
 
 
 34
 After our own study of the arguments of counsel and our own detailed review of the entire record, we are satisfied that the district court did not commit error in granting summary judgment on the record before him. The approach of the court in Arlington Heights can serve as a helpful framework for our analysis of the present situation. First, the defendants' action certainly impacted on people of Hispanic origin. However, the record before the district court on summary judgment establishes that the Grove Street Apartments had to be closed because they had been found unfit for human habitation, not because of the national origin of the tenants. There is no genuine issue of triable fact on this point--only conclusory allegations.[3] As the district court put it, "[w]e have repeatedly noted that the apartments were to be demolished; everyone living in the apartments would be displaced, regardless of their national origin...." Mem op. at 15 (emphasis in original; footnote omitted).
 
 
 35
 Nor do we believe that, on the record before the district court, there is a genuine issue of triable fact with respect to the existence of discriminatory intent. Indeed, at one point in the district court proceedings, plaintiffs' counsel admitted to the district court that "[r]ight now I don't see any intentional discrimination; what I see is a callous disregard for Hispanics." Tr. of Sept. 16, 1986 at 32 (reproduced in DuPage County's Br.App. at 10). While counsel later changed position on that point and contended that the matter was an open question, (R.57 [Plaintiffs' Statement of Genuine Issues Pursuant to Local Rule 12(f) at 6], our detailed review of the record convinces us that the district court did not err in granting summary judgment. A finding of discriminatory intent is usually based on circumstantial evidence and the district court must exercise extreme caution in granting summary judgment in such a context. Powers v. Dole, 782 F.2d 689, 694 (7th Cir.1986). However, the party with the ultimate burden of proof retains the responsibility of demonstrating that sufficient evidence exists to permit the trier of fact to reach such a conclusion on a principled basis. On the record before it, the district court could not conclude that the actions of the defendants in requiring the plaintiffs to vacate their apartments and in making available the proper relocation assistance, evidenced a discriminatory intent on the basis of national origin with respect to the retention of the present housing or the securing of alternate housing during the renovation period.
 
 
 36
 In their appellate brief and at oral argument, the plaintiffs suggested that the record on summary judgment also raises a triable issue of fact as to whether the defendants purposefully intended to discriminate against the plaintiffs with respect to their eventual return to the renovated apartment complex. After a particularly close examination of the record, we must conclude that this issue was never raised properly in the district court. Moreover, the evidence contained in the record on summary judgment does not permit such a conclusion.
 
 
 37
 With respect to the third consideration noted in Arlington Heights, the record on summary judgment demonstrates that the defendants' interest in rehabilitating the apartments was to provide safe and sanitary homes. The project was designed to benefit persons of low to moderate income; there is no evidence, in this record, to suggest that it was merely a device, intentional or otherwise, to force Hispanics out of Wood Dale. Indeed, the County asserts--unchallenged--that "numerous households from [the apartments] have in fact been able to relocate in the immediate Wood Dale/Bensenville area, and the majority of other households are relocated within an approximate five (5) mile radius from Wood Dale." DuPage County's Br. at 29 n. 6.
 
 
 38
 Fourth, in addressing the motives of the plaintiffs, courts generally focus on "the distinction between requiring affirmative action on the part of the defendant and preventing the defendant from interfering with the plaintiff's attempt[ed actions]." Arlington Heights, 558 F.2d at 1293. Here, the plaintiffs' motivations clearly fall within the latter category. The plaintiffs originally attempted to restrain the defendants from renovating their apartment building. Now they seek primarily damages for inadequacies in the relocation procedures. We do not regard the facts relevant to this fourth Arlington Heights factor to be seriously in dispute. Certainly there is no triable issue of fact that requires reversal of the grant of summary judgment.
 
 
 39
 C. The Housing and Community Development Act
 
 1. Submissions of the parties
 
 40
 The HCDA, 42 U.S.C. Sec. 5301 et seq., requires that state grants of CDBG funds be made only where the recipient local government follows a plan that provides a "reasonable opportunity for tenants displaced as a result of [rehabilitation] activities to relocate in their immediate neighborhood." 42 U.S.C. Sec. 5304(c)(1)(C)(i). The plaintiffs contend that there was alternative housing available in Wood Dale at the time that the apartments were being rehabilitated. They further claim that the defendants did not take action to relocate the plaintiffs to this alternate housing. In response, the defendants collectively contend that there is nothing in the record that indicates that alternate housing was available in Wood Dale. As a result, they submit that this court's decision in Mejia v. HUD, 688 F.2d 529 (7th Cir.1982), forecloses any recovery by the plaintiffs.
 
 2. Resolution by the District Court
 
 41
 The district court simply determined that the plaintiffs had not demonstrated, as required by the HCDA, that there was "a reasonable opportunity to relocate in the immediate neighborhood." See 42 U.S.C. Sec. 5304(c)(1)(C)(i). The court, in finding that the plaintiffs failed to present evidence that there was an opportunity to relocate in the immediate neighborhood, also admonished the plaintiffs for "espousing theories based upon facts that are nowhere alleged in the complaint and, accordingly, must be rejected." Mem. op. at 18.
 
 3. Analysis
 
 42
 In Mejia, this court noted that an application for CDBG funds
 
 
 43
 must include: (1) a Housing Assistance Plan (HAP) which provides a "reasonable opportunity" to relocate in the immediate area, required by the HCDA; (2) "satisfactory assurances" that displaced residents will be provided with "comparable replacement dwellings," required by the URA; and (3) that the City will comply with all statutory environmental review responsibilities, required by the NEPA [National Environmental Policy Act of 1969].
 
 
 44
 688 F.2d at 531. In our view, the district court correctly concluded that the plaintiffs have failed to show that there "was a reasonable opportunity to relocate in the immediate neighborhood." 42 U.S.C. Sec. 5304(c)(1)(C)(i). As we noted in Mejia, " 'the reasonable opportunity to relocate in the immediate neighborhood must be read to require assisting such relocation if housing is available.' " 688 F.2d at 532 (emphasis supplied) (quoting Mejia v. HUD, 518 F.Supp. 935, 938 (N.D. Ill.1981)). Here, the plaintiffs failed to present any evidence that housing was available in the immediate neighborhood of the apartments and that the defendants deprived them of relocating to that housing. The plaintiffs point to two documents that, they contend, evidence an availability of housing in the immediate neighborhood. The first is a letter from Wood Dale's City Manager to a manager of a Wood Dale apartment complex requesting housing for displaced Grove Street Apartments' tenants "as vacancies should become available...." Appellants' App. at 140. The second appears to be the minutes of a meeting between representatives of the defendants at a DuPage County Community Development Commission meeting. In the minutes, the only reference to housing in the immediate neighborhood is the statement: "Everyone will be helping look for available apartments for the residents of Grove Street. Wood Dale is contacting the apartment complexes in Wood Dale. Wood Dale is also asking the surrounding cities and [v]illages to do the same." Appellants' App. at 147. However, these documents hardly raise a genuine issue of triable fact with respect to the plaintiffs' assertion that housing was available.
 
 III
 87-3131
 A. Background
 
 45
 After the district court had granted the defendants' motion for summary judgment (and while the appeal was pending before this court), the plaintiffs filed a motion for relief from judgment based on newly discovered evidence pursuant to Federal Rule of Civil Procedure 60(b)(2). The motion requested relief against Mr. Chody and his business affiliates only, and only as to counts II, III, V, and VI of the complaint. The plaintiffs allege that on August 19, 1987, two of Mr. Chody's managerial employees made racial remarks concerning the tenants evicted from the apartments. These comments were made at a barbecue for the tenants at One Wood Dale Place, Mr. Chody's new name for the remodeled Grove Street Apartments. Specifically, the plaintiffs introduced affidavits from three individuals who stated that Mr. Chody's managers admitted that they intentionally had destroyed the former Hispanic tenants' personal property and turned off their utilities to induce them to relocate. The affiants also explained that the managers said they were attempting to prevent the former tenants from returning to the rehabilitated apartments. Finally, the affiants stated that the managers used racial epithets when referring to the former Hispanic tenants. The district court determined that the plaintiffs had failed to demonstrate due diligence to uncover the new evidence. Although the district court found that deposing Mr. Chody may have been futile, it concluded that deposing certain management employees "may well have uncovered evidence supporting an allegation of intentional discrimination." Gomez v. Chody, 86 C 6776, memorandum opinion and order at 4 (N.D.Ill. Dec. 8, 1987); R.103 at 4. Accordingly, the district court dismissed the plaintiffs' motion.
 
 B. Submissions of the Parties
 
 46
 The plaintiffs contend that the district court improperly denied their Rule 60(b) motion because (1) at the time they filed their complaint, they had no knowledge that intentional discrimination was involved; (2) even if they suspected intentional discrimination, deposing Mr. Chody and his employees would have been futile; and (3) the court's failure to consider the statements at the barbecue will result in substantial injustice to them. In reply, Mr. Chody and his affiliated business entities (the only defendants in this appeal) contend that the district court did not abuse its discretion in determining that the plaintiffs' claim must fail for lack of due diligence. In the alternative, Mr. Chody contends that, if considered, the new evidence would not alter the district court's grant of summary judgment to the defendants.C. Analysis
 
 
 47
 We previously have set forth the prerequisites for relief from a judgment under Rule 60(b)(2) as follows:
 
 
 48
 1) the evidence was in existence at the time of trial or pertains to facts in existence at the time of trial;
 
 
 49
 2) it was discovered following trial;
 
 
 50
 3) due diligence on the part of the movant to discover the new evidence is shown or may be inferred;
 
 
 51
 4) the evidence is admissible;
 
 
 52
 5) it is credible;
 
 
 53
 6) the new evidence is material;
 
 
 54
 7) it is not merely cumulative or impeaching; and, finally,
 
 
 55
 8) the new evidence is likely to change the outcome.
 
 
 56
 Mumford v. Bowen, 814 F.2d 328, 330 (7th Cir.1986); see Peacock v. Board of School Comm'rs, 721 F.2d 210, 213-14 (7th Cir.1983) (per curiam); United States v. Walus, 616 F.2d 283, 287-88 (7th Cir.1980); see also Fed.R.Civ.P. 60(b). Our review of a denial of a Rule 60(b) motion is governed by an abuse of discretion standard. Rothwell Cotton Co. v. Rosenthal & Co., 827 F.2d 246, 251-52 (7th Cir.1987); Mumford, 814 F.2d at 329. "To find an abuse of discretion, we must conclude that 'no reasonable man could agree with the district court.' " Mumford, 814 F.2d at 329 (quoting Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 831 (7th Cir.1985)); see Valmont Indus., Inc. v. Enresco, Inc., 446 F.2d 1193, 1195 (10th Cir.1971) ("granting or denial of [a Rule 60(b) ] motion will not be disturbed on appeal except for a manifest abuse of discretion"), cert. denied, 405 U.S. 922, 92 S.Ct. 960, 30 L.Ed.2d 793 (1972). See generally 7 J. Moore, Federal Practice p 60.19 (2d ed.1987) (collecting cases).
 
 
 57
 Given this deferential standard of review, we cannot reverse, on this record, the judgment of the district court. We especially are disinclined to substitute our judgment for that of the district court when the record affirmatively manifests that the matter received careful, thorough consideration by the district judge. The question of due diligence is certainly one where the assessment of the district judge who managed this litigation while it was in the district court is particularly worthy of deference.
 
 
 58
 Moreover, our own review of this record convinces us that there was more than ample ground for the district court's determination. The claimed discriminatory activities--primarily the shutting off of utilities and the destruction of personal property--were known to the plaintiffs at the time that they filed their complaint. Nevertheless, throughout the litigation below, they never attempted to prove--indeed, never even alleged--that Mr. Chody intentionally discriminated against them because of their race. We do not understand why this matter was not more aggressively pursued. We see no exceptional circumstances that might excuse the failure of the plaintiffs to depose Mr. Chody and/or some of his employees or to take other steps to establish a case of purposeful discrimination.
 
 
 59
 The plaintiffs also note that the district court commented in open court that it was dismissing the motion on a "technicality." This implies, they submit, that the court mistakenly believed that it had no discretion in the matter. They argue that such a mistaken belief constitutes an abuse of discretion. Cf. Heat and Control, Inc. v. Hester Indus., 785 F.2d 1017, 1022 (Fed.Cir.1986). We do not believe, however, that the plaintiffs properly characterize the position of the district court. The court, in support of its ruling, cited authority that clearly indicates the abuse of discretion standard. See R.103 at 1-2 (citing Mumford v. Bowen, 814 F.2d 328 (7th Cir.1986)). The comments made in open court, on the other hand, merely expressed the court's dissatisfaction with the potential inequity of the situation. See Tr. of Dec. 8, 1987 at 3 (reproduced in Appellants' Supp.Br.App. at S.A.4) ("it is really on a, I'll call it that, a technicality for lack of diligence on that claim that I block it, and I frankly, based on those affidavits, just shake my head about what apparently, or at least the plaintiffs allege, went on in that development....").Conclusion
 
 
 60
 Parties present cases to the court. Courts decide the cases that are presented--not cases that could possibly have been presented. We are convinced that the district court properly applied the governing legal principles to the record made by the parties and submitted to him. Accordingly, the judgments of the district court are affirmed.[4]
 
 AFFIRMED
 
 61
 CUDAHY, Circuit Judge, concurring in part and dissenting in part:
 
 
 62
 I agree with the persuasive majority opinion in all respects except its affirmance of the district court's denial of the plaintiffs' Rule 60(b)(2) motion in No. 87-3131. This is a close question and I am very much aware that the discretion of the trial judge is (and ought to be) particularly broad with respect to motions for a new trial based on newly discovered evidence. But here the new evidence of boasting by building management personnel of kicking out the "spics" and "wetbacks" was dynamite. As Judge Plunkett appears to concede, had it been available in time, it would easily have defeated summary judgment.
 
 
 63
 The district judge based his denial of the motion for a new trial on the plaintiffs' alleged lack of due diligence in discovering evidence of discriminatory intent in time for trial. Judge Plunkett, in his remarks from the bench, made quite clear the considerations that he took into account in reaching this difficult decision:
 
 
 64
 THE COURT: [T]he place I stick on reversing what I did earlier is not the material you have in the affidavits; I think if I had that material when I looked at the case initially you would have a prima facie case of intentional discrimination.
 
 
 65
 * * *
 
 
 66
 [W]here I stick is, and the reason I am denying the motion, is because under what you pled I couldn't find any evidence that plaintiffs had engaged in any kind of discovery, although it was available to them, to deal with this information.
 
 
 67
 * * *
 
 
 68
 That is why I had to agree with the defendant Chody's argument, although--I didn't say it in the opinion but I say it here, I'm not happy I am doing that because I don't like what was said out there, and I'm sure the plaintiffs don't either, and it is not a happy decision I render, and sometimes I render decisions which are I think proper under the law but not necessarily under equity.
 
 
 69
 ... [I]t is really on a, I'll call it that, a technicality for lack of diligence on that claim that I block it, and I frankly, based on those affidavits, just shake my head about what apparently, or at least the plaintiffs allege, went on in that development. My God!
 
 
 70
 Gomez v. Chody, No. 86 C 6776, trans. at 2-3 (N.D.Ill. Dec. 8, 1987) (emphasis added).
 
 
 71
 The district court also stated that, "[w]hile we agree with Plaintiffs' argument that Chody himself was unlikely to have admitted a discriminatory motive in deposition, questioning of the employees may well have uncovered evidence supporting an allegation of intentional discrimination." Gomez v. Chody, No. 86 C 6776, mem. op. at 4 (N.D.Ill. Dec. 8, 1987). It seems to me the purest speculation whether the employees would have sung any louder on the subject of bias than Chody. After all they had jobs to protect. And, if the whole Chody team had denied animus, who was to give them the lie? Only after the district court granted summary judgment and in the convivial atmosphere of a building party, did some employees let their guard down and boast of bouncing the "spics" and "wetbacks." This is the only way this solid evidence of discriminatory intent could have been generated; I am profoundly skeptical that it could have been extracted earlier. I would therefore hold that the denial of the plaintiffs' new trial request was an abuse of discretion.
 
 
 72
 Rule 60(b)(2) does provide that newly discovered evidence may justify a new trial only if the evidence could not have been discovered earlier through the exercise of due diligence. But there is an important exception to this requirement where the evidence is virtually determinative of the merits of the litigation. Thus, even if the district court's finding that plaintiffs had not exercised reasonable diligence is accepted, there are still grounds for vacating the denial of the new trial motion.
 
 
 73
 This significant exception to the due diligence requirement of Rule 60(b)(2) was first recognized in Ferrell v. Trailmobile, Inc., 223 F.2d 697 (5th Cir.1955). In that case, judgment was entered in favor of Trailmobile on the ground that Ferrell had failed to make the installment payments on a trailer he had purchased from Trailmobile. After entry of the judgment, Ferrell discovered photocopies of various money orders which conclusively demonstrated that he had, in fact, made the installment payments at issue. Although the Fifth Circuit agreed that Ferrell had not engaged in sufficient efforts to discover the evidence, it nevertheless reversed the district court's denial of his Rule 60(b)(2) motion.
 
 
 74
 If, in fact, practically conclusive evidence shows that the appellant had actually paid all eighteen installments for the purchase of the trailer, it is obvious that the judgment should be set aside to prevent a manifest miscarriage of justice. In such a case, the ends of justice may require granting a new trial even though proper diligence was not used to secure such evidence for use at trial.
 
 
 75
 Id. at 698.
 
 
 76
 The Ferrell doctrine has since been applied in other cases where the movant belatedly discovered evidence that established, virtually conclusively, that a judgment had been entered erroneously. See W.S. Dickey Clay Mfg. Co. v. Corder, 310 F.2d 764, 774-75 (5th Cir.1962) (new evidence demonstrates erroneousness of judgment "with almost mathematical certainty"); Serio v. Badger Mutual Ins. Co., 266 F.2d 418, 421 (5th Cir.1959). Other courts have recognized the existence of the Ferrell rule, while holding that it was inapplicable in a particular instance because the evidence was not sufficiently dispositive, or the movant had previously known of the evidence and had made a conscious decision not to rely on it at trial. This court referred to the doctrine in a case in which a naturalized citizen was ordered deported based on allegations that he had engaged in war crimes and atrocities as a member of the German Gestapo during World War II. United States v. Walus, 616 F.2d 283 (7th Cir.1980). After entry of the deportation order, Walus located several witnesses in Poland and France who testified that he had been a forced laborer in Poland during the war, and could not have committed the acts alleged by the United States. Although finding that Walus had exercised due diligence to discover the foreign witnesses, the court noted that "[e]ven if this failure [to timely discover the witnesses] could be characterized as neglect, and we in no way imply that it was, we nevertheless cannot hold that the results of this trial are forever insulated from reexamination. In light of the strength of the new evidence, affirmance of the district court's decision 'would be to accept an evil far greater than waste of the court's or litigants' time.' " Id. at 304 (citation omitted).[1]
 
 
 77
 OPE Shipping, Ltd. v. Underwriters at Lloyd's, 100 F.R.D. 428 (S.D.N.Y.1983), is also illustrative. In OPE, four ships owned, through various corporate entities, by General Anastasio Somoza were seized by Sandinista forces during the Nicaraguan revolution. The holding corporations brought suit, claiming that they were entitled to recover for seizure of the vessels under various "marine risk" and "war risk" insurance policies. Each policy contained a clause terminating the policy "if and when the vessel is requisitioned." After trial and appeal, the defendant insurers discovered evidence that the vessels had been commandeered by forces loyal to Somoza prior to their seizure by the Sandinistas; if this were true, the policies would not apply to the loss of the vessels. Judge Milton Pollack held that this evidence entitled the defendants to a new trial, whether or not the evidence could have been discovered through the exercise of due diligence. The district judge recognized that, as a general matter, new evidence could not support a motion for a new trial if it could have been discovered by a reasonable search. However, he also recognized that
 
 
 78
 [a] narrow exception to this rule has been recognized: a new trial may be ordered to prevent a grave miscarriage of justice even though the "newly discovered evidence" supporting that order would have been available to the moving party at trial had that party exercised proper diligence. Ferrell v. Trailmobile, Inc., 223 F.2d 697, 698 (5th Cir.1955). This exception, however, has been restricted to cases in which the evidence is practically conclusive. Niedland v. United States, 338 F.2d 254, 260 (3d Cir.1964).
 
 
 79
 Id. at 432 (other citation omitted). The court noted that, even if defendants had not exercised due diligence, a new trial would be required in order to avoid an inequitable result, since it appeared likely that the plaintiffs were aware of the requisitioning and had concealed it from the court.
 
 
 80
 Given the great likelihood that plaintiffs knew of the prior use of the Managua by the Nicaraguan military and concealed it from this Court, a new trial would be warranted on the basis of defendant's newly discovered evidence even in the absence of a showing of "due diligence." Such a proceeding would be justified in order to prevent a miscarriage of justice, namely the commission of fraud on this Court. The evidence on which defendants base their motion, moreover, is practically conclusive in establishing the May, 1979 use of the Managua as a gunboat: this motion thus falls within the Niedland ("conclusive evidence") restriction on the application of the Ferrell (prevention of miscarriage of justice justifies new trial even in the absence of the diligence showing) rule.
 
 
 81
 Id. at 434.
 
 
 82
 The same analysis applies here and should lead to the same result as in OPE. The new evidence plaintiffs seek to introduce is "practically conclusive," since in this case, all plaintiffs had to show to withstand defendant's motion for summary judgment was that a genuine factual issue existed as to defendant's motive. Clearly, drawing all inferences in plaintiffs' favor, the proffered affidavits strongly suggest that defendant Chody acted with discriminatory intent in effecting the forced removals. This evidence would be sufficient to prevent the grant of summary judgment. And there is at least a reasonable inference that the evidence was previously known to the defendants. Applying the OPE Shipping logic, a reopening may be necessary to prevent what might amount to fraud on the court. The district court's failure to appreciate the extent of its discretion under the Ferrell rule means that the denial of the plaintiffs' Rule 60(b) motion was an abuse of discretion.[2] As indicated in the quotation from its bench ruling, supra, the district court clearly acknowledged that the equities of the situation favored the plaintiff, but that it felt its hands were tied by the due diligence requirement of Rule 60(b).
 
 
 83
 Under these circumstances, where the district court has recognized that the new evidence would have prevented the grant of summary judgment, no defensible purposes are served by denying the plaintiffs' motion for a new trial. After all, the Federal Rules of Civil Procedure were promulgated "to secure the just, speedy, and inexpensive determination of every action." Rule 1 (emphasis added). Since the majority's resolution of the appeal in Number 87-3131 cannot be reconciled with this overriding purpose, I respectfully dissent from affirmance of the new trial ruling.
 
 
 
 [1]
 The DuPage County relocation plan in pertinent part provided:
 
 
 [2]
 Policy for providing optional relocation payments to households involuntarily displaced by activities of the Community Development Block Grant program
 a. Payments to Mitigate Adverse Effects: Pursuant to 24 CFR 570.606(b) of the federal regulations governing the Community Development Block Grant program and Section 105(a)(11) of the Housing and Urban Development Act of 1983, it shall be the policy of the DuPage Community Development Commission to provide relocation payments to low and moderate income households as outlined and identified in 1-B of the DuPage Community Development Commission's policy for minimizing displacement and providing relocation assistance.
 Appellants' Ex. 12, Appellants' App. at 85.
 
 
 [2]
 The URA defines "state agency" as follows:
 The term "State agency" means the National Capital Housing Authority, the District of Columbia Redevelopment Land Agency, and any department, agency, or instrumentality of a State or of a political subdivision of a State, or any department, agency, or instrumentality of two or more States or of two or more political subdivisions of a State or States.
 42 U.S.C. Sec. 4601(3).
 
 
 [3]
 The plaintiffs also contend that it is "highly improbable that the City would have prevailed if its demolition claim had been litigated...." Appellants' Reply Br. at 20. However, they have presented no evidence that requires us to reverse the finding of the district court as clearly erroneous
 
 
 [4]
 In its brief, HUD contends that one of the plaintiffs, HOPE, Inc. (HOPE), an Illinois nonprofit organization interested in seeking safe and decent housing in the County, does not have standing to bring this action. Because we find that the defendants have prevailed on all issues before this court, we need not address the propriety of HOPE's standing. See Bowsher v. Synar, 478 U.S. 714, 721, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986); Bethune Plaza, Inc. v. Lumpkin, 863 F.2d 525, 531 (7th Cir.1988)
 
 
 [1]
 See also, e.g., United States v. Philatelic Leasing Ltd., 794 F.2d 781, 788 (2d Cir.1986) (citing Ferrell; noting that "even though proper diligence is not employed to secure evidence for use at trial the ends of justice may require the granting of a new trial to present new evidence in certain limited instances"); Shook & Fletcher Insulation Co. v. Central Rigging & Contracting Corp., 684 F.2d 1383, 1385-86 n. 2 (11th Cir.1982); Niedland v. United States, 338 F.2d 254, 260 (3d Cir.1964) (refusing to grant new trial, because new evidence " 'raises only a doubt, although perhaps a disturbing doubt,' that there may have been a miscarriage of justice.... In the Ferrell case, [t]he newly-discovered evidence ... was conclusive."); In re Bahre, 28 B.R. 609, 611 (Bkrtcy.D.Conn.1983) (Ferrell doctrine limited to new evidence which is "practically conclusive.")
 
 
 [2]
 Of course, a district court's failure to recognize the scope of its discretion in rendering a decision itself constitutes an abuse of discretion, since the court's decision is based on an erroneous interpretation of the law governing its ruling. See, e.g., United States v. $103,387.27 in U.S. Currency, 863 F.2d 555, 561 (7th Cir.1988); Heat & Control, Inc. v. Hester Indus., Inc., 785 F.2d 1017, 1022 (Fed.Cir.1986); Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556, 563-64 (7th Cir.1984). Cf. Prill v. National Labor Relations Bd., 755 F.2d 941, 948 (D.C.Cir.) (agency decision must be invalidated where agency considered itself bound by statute to reach certain result, and failed to recognize its own discretion to reach contrary conclusion), cert. denied sub nom. Meyers Indus., Inc. v. Prill, 474 U.S. 948, 971, 106 S.Ct. 313, 352, 88 L.Ed.2d 294, 320 (1985)